Revised November 6, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

Nos. 96-11443 & 96-11588
_____


UNITED STATES OF AMERICA,

                    Plaintiff-Appellee

v.

CHARLES RANDELL GREER,

                    Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Texas
_____
                    October 16, 1998
Before KING, SMITH and PARKER, Circuit Judges.

KING, Circuit Judge:

    Defendant-appellant Charles Randell Greer appeals the
district court's enhancement of his sentence for obstruction of
justice.  We affirm.

                I.  FACTUAL AND PROCEDURAL BACKGROUND

    The history of this case is long and complicated.  During
the summer of 1994, defendant-appellant Charles Randell Greer, a
convicted felon with a lengthy criminal record, one previous
determination of incompetency, and numerous commitments to
psychiatric facilities, was homeless.  Joyce Cantrell, a resident

of Lubbock, Texas for whom Greer had done odd jobs, offered to let him stay in her garage apartment, and he moved in on July 16, 1994. That evening, he asked to use the telephone in Cantrell's house. Cantrell allowed him to do so, but when he finished his conversation, he was distraught and, without permission, entered her bedroom and lay down on her bed. When Cantrell asked him to leave, he grabbed her wrists and told her, "Don't cause me any problems." In order to appease Greer, Cantrell offered to cook him dinner, and when he returned to the bedroom, she escaped from the house and called the police. Greer had left by the time the police arrived, but when Cantrell returned the next morning, she discovered human excrement smeared in the bathroom and bedroom, and a .22 caliber revolver was missing.

The evidence at trial showed that after Cantrell left her house on the evening of July 16, Greer went to the home of Arthur Follows, another Lubbock resident for whom he had done odd jobs. Follows had befriended Greer in the past, giving him a ride to the hospital when Greer claimed that his grandfather had attempted suicide and then to Greer's uncle's house when Greer decided that he would rather see the uncle. At about 10 or 11 p.m., an agitated Greer arrived at Follows's home and asked to take a shower. Follows permitted him to do so, but told him that he would have to leave afterward. After Greer showered, however, he went to Follows's bedroom. Normally soft-spoken and shy, he

2

began cursing loudly, telling Follows that no one cared about him.

At that point, Follows ordered Greer to leave. Greer then struck Follows, who fell back onto the bed, and bound him at gunpoint. He told Follows that he wanted Follows to drive him away from Lubbock because he wanted to kill himself, and the two men left in Follows's car. Greer, who kept the gun pointed at Follows with his finger on the trigger, told Follows to drive him to Clovis, New Mexico. During the journey, Greer drank heavily and continued to complain that no one cared about him. When Follows reached Clovis, he began to pull into the bus station, enraging Greer, who jammed the revolver into Follows's ear and then his side. Greer ordered Follows to drive to Albuquerque, but when they arrived, Greer became very sad, apologized to Follows, and asked to be taken to a motel, where he paid for a room with Follows's Mastercard. He indicated that he had achieved the purpose of the kidnapping--to be a long way from his family and friends when he committed suicide--and apologized again. He then allowed Follows to leave and entered the motel room alone. Follows immediately called the police, who arrested Greer at the motel. A federal grand jury indicted Greer on five counts: (1) kidnapping; (2) using and carrying a firearm during and in relation to a crime of violence; (3) possession of a stolen firearm; (4) transporting a stolen firearm in interstate commerce; and (5) being a felon in possession of a firearm.

The post-arrest events were even stranger than the kidnapping itself. After Greer's arrest, a doctor attached to the Bernalillo County Detention Center in New Mexico gave him a prescription for two anti-psychotic drugs, Thorazine and Elavil, as well as an anti-depressant and medication to counteract the side effects of the anti-psychotics. Greer was also found incompetent to stand trial on the New Mexico state charges stemming from Follows's kidnapping. On November 14, 1994, pursuant to a joint motion filed by Greer and the Government, the district court ordered Greer committed to the custody of the Attorney General to undergo a competency evaluation. After a 1-1/2 month evaluation at the United States Medical Center for Federal Prisoners in Springfield, Missouri (FMCP-Springfield), Greer returned to Lubbock. The district court held a competency hearing on April 21, 1995. After local jail personnel and the FBI case agent testified to evidence tending to demonstrate Greer's competency, the Government called Dr. Richard Frederick, Greer's forensic psychologist at FMCP-Springfield, who testified not only that Greer was competent to stand trial, but that he was feigning psychotic illness. Dr. Frederick stated that he came to his conclusion based, in part, on a three-page narrative Greer wrote that cogently set forth his "understanding" of the crime-- namely, that Follows had sexually assaulted him and had concocted the kidnapping story to save himself from punishment. Greer called only one witness, a local psychiatrist named Preston Shaw,

4

who testified that Greer was incompetent. The district court determined that Greer was competent.

As trial preparation continued, Greer's bizarre behavior prompted his attorney to file another motion to determine competency.[1] The district court initially denied the request but later granted it after the Government declined to oppose the motion. Greer was examined by Dr. Ross Taylor, a psychiatrist with the Texas Department of Corrections. Taylor determined that Greer was incompetent, the Government acquiesced to allowing Greer to be adjudicated incompetent, and on February 8, 1996, the district court executed an agreed order committing Greer to the custody of the Attorney General until such time as his competency was restored.

On June 25, 1996, after receiving a psychiatric evaluation from the Federal Medical Center in Rochester, Minnesota (FMC-Rochester), the district court ordered a second competency hearing. On July 17, 1996, the court convened a competency hearing at which Dr. Mary Alice Conroy, a psychologist who had evaluated Greer during his commitment at FMC-Rochester,

---

[1] Defense counsel received correspondence from Greer indicating that he believed that the courtroom was a church, the judge was a preacher, and the first competency hearing was a funeral. In other letters, Greer claimed that his attorney was trying to kill him and complained of a loud "ringing." Greer also told his attorney that he believed he was charged with killing several people and did not remember Arthur Follows or understand that he was accused of kidnapping him. Finally, there was no evidence that Greer understood the Government's plea bargain.

testified. Conroy stated that because Greer was referred for restoration of competence, the medical staff initially presumed that he suffered from a serious mental disease that rendered him incompetent. But after observing Greer for nearly two months, Greer's treating psychiatrist, Dr. Sigerson, was unable to find any active psychotic process or serious mental disease. During Greer's case conference, in which six members of the medical staff involved in Greer's treatment and evaluation, including Dr. Sigerson and Dr. Conroy, participated, concluded that there was no evidence of psychotic process. Conroy opined that Greer was a malingerer, although she conceded that Greer had a personality disorder with antisocial and borderline tendencies that could not be treated. As to the nature of Greer's disorder, Conroy testified: "A character disorder, unlike a mental illness, does not disrupt cognitive processes or cause confusion, it doesn't compel anyone to do anything. They do not lose control. A person who has a character or personality disorder has control over his/her actions."

The day before trial, the district court found not only that Greer was competent but that he had feigned mental illness:

> On July 17, 1996, the Court conducted an evidentiary hearing on this matter, wherein the Court heard the testimony of Dr. M.A. Conroy, a psychologist employed by the Bureau of Prisons at FMC-Rochester. Dr. Conroy evaluated Defendant Greer. Dr. Conroy testified, as did Dr. Richard Frederick of FMCP-Springfield during the hearing held April 21, 1995, that Defendant Greer was not even suffering from a severe mental disease or defect. Both experts believe Defendant Greer to be malingering. Based on these experts' testimony

6

and the exhibits introduced by the Government during the July 17, 1996 and April 21, 1995 hearings, the Court concludes, by a preponderance of the evidence, that Defendant Greer is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense. In this regard, the Court adopts the findings of Dr. Conroy and Dr. Frederick, as set forth in their reports . . . .

Greer's trial began on August 7, 1996. At approximately 10:30 a.m. on the first day, after voir dire and while the attorneys were making peremptory challenges, the marshals informed the district court that Greer had taken his clothes off and attempted to flush them down the holding cell toilet. During the resulting delay, Greer spit up between ten and sixteen half-dollar-sized splotches of blood and was taken to a local hospital. In Greer's absence, at approximately 11:15 a.m., the court called the names of the twelve jurors, seated them, administered their oath, and recessed the trial until 1:30 p.m. After Greer returned from the hospital, the court stated, outside the presence of the jury:

> Just to backspace a bit, yesterday I entered an order finding the Defendant Mr. Greer competent to stand trial. In that order I found and find today that Mr. Greer is a malingerer, that he is a feigner, and that he is a fraud to medical personnel, and he has been doing this for a period of time now. I believe that he is competent to stand trial, and I am fully prepared to continue with this trial this afternoon.
> . . . .
> At approximately 10:15 we recessed the court for 15 minutes so that the attorneys could conduct their peremptory challenges to the jury panel in order to select this jury. During that recess, the court was informed that Mr. Greer, who had been taken downstairs to the Marshal's holding cell, had taken off all of his clothes, and apparently had attempted to flush those clothes down the toilet. In

7

addition, Mr. Greer apparently tried to start throwing up some type of blood.

. . . .

It is now 1:24. Mr. Greer is back in court, and I have not been advised as to what the findings were at the emergency room, and I would entertain any statement on the record at this point.

The prosecution then called the jail's director of infirmary services, Lauren McQuitty, to testify. McQuitty stated that an evaluation of Greer at the hospital had determined a mucosal abrasion in his mouth to be the cause of the bleeding; that such abrasions commonly were caused by self-inflicted scratches; and that Greer's fingernails were about an inch long. McQuitty also noted that, from the appearance of the blood, it appeared that Greer was gagging himself, rather than vomiting blood from the stomach, intestine, or liver. After McQuitty's testimony, the court stated the following on the record, but outside the presence of the jury:

I am finding based upon the medical report that the defendant created an abrasion in his mouth, so as to cause some bleeding, which in my mind is a further deliberate attempt on his part--I am talking about Mr. Greer--to derail the trial of this case.

Now, Mr. Greer, before I bring the jury back in, I want you to listen to me very carefully. I think you are a malingerer. I have found you competent to stand trial. We are going to have this trial. If you act up or try to disrupt this trial while you are in this courtroom, I am going to have you removed from this courtroom, and we will try the case in your absence.

Mr. Greer, I have told you this once before, but you had better get very serious about defending this case. . . . Now, you better take these thoughts into consideration, get with the program, and stop acting like a fool.

Greer responded, "Yes, sir, your honor."

8

Toward the end of the day, during the testimony of an Albuquerque, New Mexico police officer, Greer suddenly jumped out of his chair and shouted, "Get it away. Stop." Greer yelled "Stop!" once more before he was subdued. Outside the presence of the jury, the court ordered Greer removed from the courtroom, and the proceedings continued without Greer for the remainder of the first day.

At the beginning of the second day of trial, the court conducted another hearing outside the jury's presence. During the hearing, defense counsel noted that he had visited Greer earlier that morning and, in response to the question of whether he wanted to appear in court that day, Greer asked, "Why are you trying to kill me?" In an attempt to calm Greer, counsel said, "Charles, nobody is trying to kill you. I am just trying to help you. I need you to help yourself and talk to me about your case." Greer responded, "Fuck you. Get out of here." After repeating the expletive some ten to fifteen times, Greer lunged at counsel in an attempt to hit him through the bars in the conference room. Greer stated: "You and that judge are going to get investigated . . . . I am going to call the judicial conduct commission on that damn judge, and I am going to get the State Bar on you." The court then found that Greer had "consciously, deliberately, and voluntarily" waived his right to be present during trial. The jury convicted Greer in his absence of all the counts against him.

9

At sentencing, the Government objected to Greer's presentence report because it did not enhance his sentence for obstructing justice. The Government argued that because Greer had feigned mental illness prior to and during (by flushing his clothes in the toilet, scratching his throat to give the appearance of throwing up blood, and shouting and jumping out of his chair) trial, the court should increase his offense level pursuant to Sentencing Guidelines § 3C1.1.[2] The district court granted the Government's objection, resulting in a two-level offense level enhancement for obstruction of justice. The court stated at sentencing:

> I will add two points for obstruction of justice. I find that the Defendant is a malingerer, that he feigned a mental illness, thereby causing the Court and the Bureau of Prisons to waste a considerable amount of time and effort in addressing that particular situation.
> I also find that during the trial the Defendant intentionally flushed his clothing down the toilet in the Marshal's holding cell, he scratched the back of throat in an attempt to cough up blood, and thereby stall the proceedings. It is my recollection that we had the Defendant taken to the emergency room at U.M.C. to have that checked. We had a nurse come over and look, a paramedic come over and look at his throat.
> The Court recalls that during the trial at one point the Defendant did leap out of his chair and yell at a witness, requiring the Court to have the Defendant removed from the Courtroom. All of these facts amount to an intentional
> obstruction of justice on the part of the Defendant.

---

[2]  Section 3C1.1 reads: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."

10

Without the obstruction of justice enhancement, Greer's sentencing range for counts 1, 3, 4, and 5 would have been 100-125 months.  His conviction on count 2 under § 924(c) carried a sixty-month sentence to be imposed consecutively to any other term of imprisonment.  The obstruction of justice enhancement increased Greer's sentencing range on counts 1, 3, 4, and 5 to 120-150 months.  The district court imposed a 150-month sentence for count 1 (kidnapping) and concurrent sentences on counts 3 through 5.  The court then imposed a sixty-month sentence for count 2, to run consecutive to the other sentences, as required by law.  Greer thus received a 210-month sentence with the obstruction of justice enhancement, whereas without the enhancement the maximum sentence he could have received was 185 months.  Greer appealed.

## II.  STANDARD OF REVIEW

We review the district court's application of the Sentencing Guidelines de novo, see United States v. Sylvester, 143 F.3d 923, 931 (5th Cir. 1998), and its factual findings, such as a finding of obstruction of justice, for clear error, see United States v. Upton, 91 F.3d 677, 687 (5th Cir. 1996), cert. denied sub nom. Barrick v. United States, 117 S. Ct. 1818 (1997).  A sentence will be upheld on appeal unless it was imposed in violation of law; imposed as a result of an incorrect application of the

sentencing guidelines; or outside the range of the applicable sentencing guideline and is unreasonable.  See United States v. Wyjack, 141 F.3d 181, 183 (5th Cir. 1998) (citing United States v. Garcia, 962 F.2d 479, 480-81 (5th Cir. 1992)).  "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  Stinson v. United States, 508 U.S. 36, 38 (1993); see also U.S. SENTENCING GUIDELINES MANUAL § 1B1.7 (1997) ("Failure to follow [the commentary that accompanies the guideline sections] could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal.") (citing 18 U.S.C. § 3742).

## III.  DISCUSSION

On appeal, Greer argues that while he was legally competent, he suffered from antisocial, borderline, and impulsive personality disorders, that the actions forming the basis for the obstruction of justice enhancement were manifestations of these diagnosed psychological problems, and that a sentencing court therefore may not apply the enhancement to punish his conduct. The Government contends that Greer's personality disorders did not compel his actions; rather, he intentionally feigned incompetence and disrupted his trial, thus attempting to and actually obstructing justice within the meaning of § 3C1.1.  This issue--whether the sentencing court may apply § 3C1.1 to punish a

12

defendant with a history of psychological problems and diagnosed personality disorders who allegedly feigns mental illness and acts disruptively in court--is res nova in this circuit and, as far as we know, in every other circuit.[3]

A.  *Does § 3C1.1 Apply to Feigning Incompetence?*

We first must determine whether a defendant's feigning incompetence is the type of conduct to which § 3C1.1 applies.  If it is not, then we must reverse as a matter of law and remand for resentencing.  If it is, we must consider whether the district court properly applied § 3C1.1 in this case.

We begin our analysis by examining the Guidelines themselves.  Section 3C1.1 is titled "Obstructing or Impeding the Administration of Justice" and reads: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution,

---

[3]  Justice Douglas briefly alluded to this sort of issue in the seminal case of Illinois v. Allen, 397 U.S. 337 (1970). Allen held that a trial court may exclude from his own trial a defendant who persists in disruptive conduct despite repeated warnings from the judge.  See id. at 345-46.  Justice Douglas expressed some concern about the mental state of the defendant:

> There is more than an intimation in the present record that the defendant was a mental case. . . . The fact that a defendant has been found to understand "the nature and object of the proceedings against him" and thus competent to stand trial does not answer the difficult questions as to what a trial judge should do with an otherwise mentally ill defendant who creates a courtroom disturbance.  What a judge should do with a defendant whose courtroom antics may not be volitional is a perplexing problem which we should not reach except on a clear record.

Id. at 351-52 (footnote omitted).

13

or sentencing of the instant offense, increase the offense level by 2 levels." U.S. SENTENCING GUIDELINES MANUAL § 3C1.1 (1995).[4] The Guidelines Manual does not define "obstruct," but the application notes to § 3C1.1 provide some guidance as to the type of conduct to which the obstruction enhancement applies. For example, although "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness," id. application note 2, § 3C1.1 is not intended to punish a defendant for the exercise of a constitutional right, see id. application note 1. The application notes also list examples of the type of conduct to which the obstruction enhancement applies: (1) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do

_____

[4] Greer committed the crimes of conviction in July 1994, was convicted in August 1996, and was sentenced in December 1996. The district court must use the Guidelines Manual in effect on the date that the defendant is sentenced. See U.S. GUIDELINES MANUAL § 1B1.11(a) (1995). If, however, the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the U.S. Constitution, the court should use the Guidelines Manual in effect on the date that the offense of conviction was committed. See id. § 1B1.11(b). The record in this case does not reveal what edition of the Guidelines the district court used when sentencing Greer, although it presumably applied the version in effect in December 1996. Greer did not object, either at trial or in his briefs to this court, that doing so violated the ex post facto clause. Our references to the Sentencing Guidelines Manual therefore will be to the edition in effect at the time of Greer's sentencing in December 1996. The Sentencing Commission did not publish a full revised edition of the Guidelines Manual in 1996; instead, it produced only a short Interim Publication which, used in conjunction with the 1995 Guidelines Manual, constitutes the version of the Manual in effect beginning October 1, 1996.

so; (2) committing, suborning, or attempting to suborn perjury; (3) producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding; (4) destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding, or attempting to do so; (5) escaping or attempting to escape from custody before trial or sentencing, or willfully failing to appear, as ordered, for a judicial proceeding; (6) providing materially false information to a judge or magistrate; (7) providing materially false information to a probation officer in respect to a presentence or other investigation for the court; and (8) other conduct prohibited by 18 U.S.C. §§ 1501-1516. See id. application note 3. The application notes also provide a non-exhaustive list of the types of conduct to which the guideline does not apply, but which may be punished with a greater sentence within the otherwise applicable guideline range: (1) providing a false name or identification document at arrest, except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense; (2) making false statements, not under oath, to law enforcement officers, unless it is a materially false statement that significantly obstructed or impeded the official investigation or prosecution of the instant offense; (3) providing incomplete or misleading information, not amounting

15

to a material falsehood, in respect to a presentence investigation; and (4) avoiding or fleeing from arrest.  See id. application note 4.

Thus, the commentary to § 3C1.1 does not explicitly refer to the act of feigning incompetence in order to avoid trial, conviction, or sentencing.  Our analysis of the application notes convinces us, however, that such malingering is more like the types of conduct to which § 3C1.1 applies than those to which it does not.  In general, the acts in the latter category, while dishonest, carry little risk of significantly impeding the investigation or prosecution of a case and require substantially less planning than those in the category of behavior to which § 3C1.1 applies.  For example, providing a false name at arrest and making false, unsworn statements to law enforcement officers trigger § 3C1.1 only if they actually significantly obstruct or impede the investigation or prosecution.  Similarly, providing incomplete or misleading information in respect to a probation officer runs afoul of § 3C1.1 only if the falsehoods are material.  Furthermore, it may be that unsworn communications to law enforcement officers, not to mention decisions to flee from arrest, are likely to be made on the spur of the moment and reflect panic, confusion, or mistake rather than a deliberate attempt to obstruct justice.  In short, § 3C1.1 excludes conduct that does not tend to reflect a considered effort to derail

16

investigations and prosecutions or significantly increase the risk that this in fact will happen.

The types of conduct listed in Application Note 3 are quite different. They involve egregiously wrongful behavior whose execution requires a significant amount of planning and presents an inherently high risk that justice will in fact be obstructed. We believe that feigning incompetency in order to avoid trial and punishment is more analogous to this class of conduct than to that described in Application Note 4. Putting on the pretense of incompetency demands not only dramatic ability but planning and resolve. Unlike providing false identification at arrest and avoiding arrest altogether, it is not the result of a spur of the moment decision. Nor can it stem from merely panic, confusion, or mistake. And, of course, a criminal defendant's sanity is always material: If he succeeds at convincing the court of his incompetency, he does not only increase his chances of acquittal, as he would if he committed perjury or falsified a record; he makes it impossible even to try him. Thus, it appears, from an analysis of the text of the Guidelines Manual alone, that § 3C1.1 applies to the act of feigning incompetency.

Although there are no cases precisely on point, the courts have found behavior similar in purpose or effect to feigning incompetency to trigger § 3C1.1. For example, a court may use the obstruction enhancement to punish a defendant who lies on the stand about his mental state. See United States v. Abdelkoui, 19

17

F.3d 1178, 1182-83 (7th Cir. 1994) (affirming the district court's application of § 3C1.1 where the defendant claimed that he was incapacitated by attacks of hypoglycemia that prevented him from forming the requisite intent and was later determined to be lying).  Section 3C1.1 also applies to material lies about physical condition and its effect on mental state.  See United States v. Hall, 101 F.3d 1174, 1178-79 (7th Cir. 1996) (approving a § 3C1.1 enhancement where the defendant falsely claimed that his confession could not be voluntary because it was the product of a methamphetamine-induced psychosis).  In the same vein, providing false handwriting samples may also trigger the enhancement.  See United States v. Yusufu, 63 F.3d 505, 514-15 (7th Cir. 1995) (affirming a § 3C1.1 enhancement for a defendant who willfully disguised a handwriting exemplar to be provided to the FBI for comparison to writings that were to be introduced at trial); United States v. Valdez, 16 F.3d 1324, 1335-36 (2d Cir. 1994) (upholding an obstruction of justice adjustment based in part on the defendant's ultimately unsuccessful attempt to disguise his handwriting when giving exemplars under subpoena for comparison with his date book of drug records).  Failing to report to give samples is also an obstruction of justice.  For example, the Ninth Circuit has held that a defendant claiming diminished capacity who refuses to submit to court-ordered psychiatric testing so that the prosecution can respond to his defense obstructs justice within the meaning of § 3C1.1.  See

18

United States v. Fontenot, 14 F.3d 1364, 1372 (9th Cir. 1994).

Defendants who refuse to provide court-ordered handwriting

samples have also been found to obstruct justice.  See United

States v. Taylor, 88 F.3d 938, 944 (11th Cir. 1996); United

States v. Ruth, 65 F.3d 599, 608 (7th Cir. 1995).  A defendant

who feigns incompetency essentially provides a false "sample,"

lying about his psychiatric condition in order to convince the

court that he cannot be found guilty--or, for that matter, even

put on trial.

The fact that each of the above examples, unlike feigning

incompetency, fits under one of the categories of behavior that,

according to Application Note 3, triggers the obstruction

enhancement[5] is a distinction without a difference.  The

application note makes clear that its list is non-exhaustive, and

as the Seventh Circuit has noted, the guideline is concerned more

---

[5]  Abdelkoui and Hall involve perjury.  See U.S. SENTENCING
GUIDELINES MANUAL § 3C1.1 application note 3(a) (1995).  Although
Yusufu and Valdez do not explain precisely why disguised
handwriting exemplars amount to an obstruction of justice within
the meaning of § 3C1.1, at least one case has suggested that this
is so because they are falsified samples, the knowing submission
of which violates 18 U.S.C. § 1512(b).  See United States v.
Porat, 17 F.3d 660, 665-66 (3d Cir. 1994), judgment vacated on
other grounds, 515 U.S. 1154 (1995).  Violations of 18 U.S.C. §§
1501-1516 trigger § 3C1.1.  See U.S. SENTENCING GUIDELINES MANUAL
§ 3C1.1 application note 3(i) (1995).  As for Fontenot and
Taylor, disobedience to a court order, however, is a violation of
18 U.S.C. § 1509 and therefore triggers § 3C1.1 under Application
Note 3(i).  See id.  Moreover, failure to appear for a court
proceeding is "inherently obstructive."  See United States v.
Labella-Szuba, 92 F.3d 136, 138-39 (2d Cir.), cert. denied, 117
S. Ct. 624 (1996).

with the effect of potentially obstructive conduct than with formalistic definitions.  See United States v. Harrison, 42 F.3d 427, 431 (7th Cir. 1994) ("Unquestionably, the guideline is less concerned with whether the false information was given under oath than with the information's effect on a judicial decision or investigation.").  Moreover, feigning incompetency may well fall under a broad interpretation of Application Note 3(b), which refers to producing or attempting to produce a false record: A defendant who playacts psychosis essentially tries to create a record that includes inaccurate testimony and factual conclusions.  Such behavior may also implicate Application Note 3(i), which states that § 3C1.1 applies to conduct prohibited by 18 U.S.C. §§ 1501-1516.  For example, a defendant violates 18 U.S.C. § 1512 when he tells a potential witness a false story as if the story were true, intending that the witness believe the story and repeat it to a grand jury.  See United States v. Rodolitz, 786 F.2d 77, 81-82 (2d Cir. 1986); see also United States v. Gabriel, 125 F.3d 89, 102 (2d Cir. 1997); United States v. Bordallo, 857 F.2d 519, 525 (9th Cir. 1988), opinion amended on reh'g by 872 F.2d 334 (9th Cir. 1989).  Similarly, a defendant who feigns incompetency misrepresents his psychiatric condition to his examiners, intending that they will believe him and convey their inaccurate impressions to the court.

    Greer makes two primary arguments why feigning incompetency does not trigger the obstruction enhancement.  First, he

contended at oral argument that § 3C1.1 applies only when the underlying conduct constitutes a crime in and of itself. Because it is not a crime to move the court for a competency hearing or to jump up and cry out in court, he claims, his behavior lies outside the scope of the enhancement. Our review of the record reveals, however, that the district court found that Greer obstructed justice not because he requested a competency hearing and disrupted his trial, but because he feigned incompetency. Thus, the relevant question is whether feigning incompetency, not requesting a competency hearing or speaking out of turn in court, falls within the ambit of § 3C1.1. As we discussed above, there is support in the case law for the proposition that feigning incompetency in an effort to delay or avoid trial and punishment violates 18 U.S.C. § 1512, and thus triggers § 3C1.1 according to Application Note 3(i).

Greer's second argument, that applying § 3C1.1 enhancements to defendants who feign incompetency impermissibly chills their constitutional right not to be tried if they are incompetent, has somewhat more merit. It is well-established that § 3C1.1 cannot be applied to punish a defendant for the exercise of a constitutional right. See U.S. SENTENCING GUIDELINES MANUAL § 3C1.1 application note 1 (1995). It is equally well-established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. See Drope v. Missouri, 420 U.S. 162, 171 (1975); Pate v.

21

Robinson, 383 U.S. 375, 386 (1966).  Thus, § 3C1.1 cannot be used to enhance the sentence of a defendant simply because he or his attorney requests competency hearings.

The Supreme Court confronted an analogous problem in United States v. Dunnigan, 507 U.S. 87 (1993), in which the Court upheld the application of the obstruction enhancement to a defendant who committed perjury at trial, despite her argument that such use of § 3C1.1 would chill her constitutional right to testify on her own behalf.  In rejecting this argument, the Court pointed out that "[o]ur authorities do not impose a categorical ban on every governmental action affecting the strategic decisions of an accused, including decisions whether or not to exercise constitutional rights."  Id. at 96.  The Court further observed that "a defendant's right to testify does not include a right to commit perjury."  Id.  Moreover, the Court found, § 3C1.1 enhancements for perjury do not create an unconstitutionally high risk that district courts will order enhancement as a matter of course whenever the accused takes the stand and is found guilty, because if the defendant challenges a sentence increase based on perjured testimony, the trial court must make findings to support all the elements of a perjury violation in the specific case. See id. at 95.

Similarly, applying the obstruction enhancement to defendants who willfully feign incompetency in order to avoid trial and punishment does not unconstitutionally chill a

22

defendant's right to seek a competency hearing. While a criminal defendant possesses a constitutional right to a competency hearing if a bona fide doubt exists as to his competency, he surely does not have the right to create a doubt as to his competency or to increase the chances that he will be found incompetent by feigning mental illness. Of course, our finding that § 3C1.1 may be applied to malingerers is not meant to encourage or justify automatically increasing sentences for all defendants who seek a competency hearing and ultimately are found competent. As in Dunnigan, if a defendant challenges a sentence increase based on feigned incompetency, the district court must make findings to support its ruling. Nor does our decision today put defense counsel to the Hobson's choice of forgoing competency hearings for a client who may well be incompetent (and thereby creating grounds for an ineffective assistance of counsel claim) or requesting such hearings and exposing the client to the risk of a § 3C1.1 enhancement if he is ultimately found competent. Counsel should warn his client that feigning incompetency, whether to create doubt as to his competency so as to prod his attorney into requesting competency hearings or to convince the court that he cannot stand trial, will trigger a § 3C1.1 enhancement. If the defendant is found competent, and the court later determines that he feigned incompetency in order to delay or avoid his day of reckoning, it will apply the enhancement. If the court finds, however, that the defendant did not feign

23

incompetency but that there was simply a bona fide doubt about his mental health that did not rise to the level of incompetency, then it may not increase the sentence. In either case, the defendant and his attorney need not choose between a competency hearing and avoiding an obstruction enhancement.

B. *Does § 3C1.1 Apply to Defendants with a History of Mental Illness or Who Are Presently Suffering From Personality Disorders?*

Greer's case presents questions of special difficulty, however, because there was substantial doubt as to both his competency and the role that his diagnosed personality disorders played in his allegedly obstructive behavior. This observation leads to two arguments against permitting a § 3C1.1 enhancement in this case. The first contends that because Greer's history of mental illness and his bizarre behavior at trial were sufficient to raise substantial doubts about his competency, any pretense of insanity did not cause the court or the government to expend additional resources or result in delay. In other words, because there were sufficient doubts about Greer's competency even absent his allegedly obstructive conduct, he cannot be punished for creating additional doubt because there was no risk that his behavior could obstruct justice. We find Greer's analysis unpersuasive.

First, even if there is sufficient evidence to justify a competency hearing absent the defendant's machinations, feigning incompetency during a psychiatric evaluation would seem always to increase the risk that the defendant will erroneously be found incompetent.  More important, § 3C1.1 itself indicates that it applies to attempts to obstruct justice as well as to the actual obstruction of justice.[6]  Even if the defendant's actions could have had no impact whatsoever on the course of events leading to his being found competent, his attempt to manipulate the judicial system reflects on his character and is therefore a relevant consideration at sentencing.  Cf. Dunnigan, 507 U.S. at 94 (observing that a defendant's perjury is relevant to the sentencing decision because "it reflects on a defendant's criminal history, on her willingness to accept the commands of the law and the authority of the court, and on her character in general").  Indeed, our sister circuits have considered and rejected the argument that a defendant should not be punished for obstructing justice unless his actions imposed some incremental burdens upon the government, either in investigation or proof, which would not have been necessary but for the defendant's actions.  The Third Circuit applied this rule in perjury cases, see United States v. Colletti, 984 F.2d 1339, 1348 (3d Cir.

---

[6]  A skeptic might argue that attempts that cannot possibly succeed do not qualify as "attempts" under the substantive criminal law.  We point out, however, that factual impossibility is not a defense to a charge of attempt.

25

1992), but the Tenth and Sixth Circuits rejected this approach, finding that Dunnigan had discredited it, see United States v. Ledezma, 26 F.3d 636, 645 n.1 (6th Cir. 1994); United States v. Fitzherbert, 13 F.3d 340, 340-45 (10th Cir. 1993). The Third Circuit itself no longer recognizes the Colletti rule as good law. See United States v. Fiorelli, 133 F.3d 218, 223 (3d Cir. 1998) ("Thus, even if our statement in Colletti had not been dicta, its vitality would not have survived Dunnigan."); see also United States v. Jaramillo, 4 F. Supp. 2d 341, 346-47 (D.N.J. 1998) (same). Moreover, the rule that the defendant's actions produce a particular effect is inconsistent with the language of § 3C1.1, which explicitly applies to attempts to obstruct justice, and to the general consensus among the courts of appeals that even an unsuccessful attempt to obstruct justice triggers the enhancement.

The second argument against applying § 3C1.1 in this case focuses on Greer's diagnosed antisocial and borderline personality disorders, which the Government's expert testified made him "impulsive," "authoritarian," "self-defeating," "concerned about [his] immediate needs, often at the expense of long term goals," and caused him to "behave in ways that violate the expectations and morals of society, and [he] really [doesn't] care." Individuals with antisocial and borderline personality disorders are, the expert testified, "probably the two most difficult people to deal with in the universe." Greer argues

26

that because his personality disorders affect his behavior, it is far from clear that his conduct demonstrates, in <u>Dunnigan</u>'s language, that he is "unwilling" to submit to the court's authority or that he possesses a culpable character. He therefore urges us to hold that in order to apply an obstruction enhancement, the district court must find that the defendant's willful acts were not the result of any other mental disease or defect suffered by the defendant at the time of those acts' commission, notwithstanding any separate finding of competency on the defendant's part. We decline to do so.

We recognize that in order to enhance a defendant's sentence based on feigned incompetency, a district court must carefully consider whether the defendant has engaged in such behavior in a conscious and deliberate attempt to obstruct or impede the administration of justice, and the presence of other psychiatric problems often will make it difficult to determine whether the defendant's action was "willful" within the meaning of the Guidelines. This is the sort of factual determination with which we entrust the district courts, however. We believe that the requirement that the district court find that the defendant "willfully" obstructed or attempted to obstruct justice adequately protects against the danger that the defendant will be punished for nonvolitional conduct.

We have held that "willful" means conscious, deliberate, voluntary, and intentional. In other words, the defendant's

27

conduct must have been volitional.  See United States v. O'Callaghan, 106 F.3d 1221, 1223 (5th Cir. 1997).  Although we have not explicitly held that the defendant must have the specific intent that his actions or statements obstruct justice, we have indicated that we define "willful" in accordance with the Second Circuit's opinion in United States v. Reed, 49 F.3d 895, 901 (2d Cir. 1995).  See O'Callaghan, 106 F.3d at 1223 n.5.  Reed holds that a § 3C1.1 enhancement "implies a mens rea requirement," "is appropriate only if the defendant had the specific intent to obstruct justice, i.e., . . . the defendant consciously acted with the purpose of obstructing justice," and requires the district court to "make a specific finding of intent."  Reed, 49 F.3d at 900-01 (citations and internal quotations omitted).  Especially where a defendant has a history of bizarre behavior and questionable competency, the district court must closely scrutinize the record to ensure that the basis for the obstruction enhancement is the sort of calculated attempt to derail justice that evidences a desire to avoid the authority of the court or to escape the commands of the law.  While we cannot say that no psychiatric condition short of incompetency could ever prevent the defendant from acting "willfully," we note that our system regularly permits the conviction and sentencing of defendants who are "antisocial" or "borderline."  It may even be true that a majority of our prison population suffers from some type of psychiatric condition.  See United States v. Henley,

28

8 F. Supp. 2d 503, 505 (E.D.N.C. 1998); see also Madden v. Collins, 18 F.3d 304, 307 (5th Cir. 1994) (holding that there was insubstantial evidence that the appellant's criminal actions were attributable to his antisocial personality where there was no testimony that he was incapable of controlling his impulses or unable to distinguish right from wrong); United States v. Bright, 517 F.2d 584, 586 (2d Cir. 1975) ("All humankind is heir to defects of personality.").

Thus, the mere fact that a defendant suffers from a personality disorder does not make him immune to a § 3C1.1 enhancement. We emphasize, however, that in the case of a defendant whose competency is questionable, there may be increased doubt as to whether the conduct that forms the basis for the obstruction enhancement is a calculated attempt to mislead the district court into finding the defendant incompetent or merely the result of his psychiatric condition. This is especially so in the case of a defendant with a personality disorder, which may cause him to act impulsively or make it difficult (if not impossible) to control his behavior. Cf. Kansas v. Hendricks, 117 S. Ct. 2072, 2080 (1997) (upholding as constitutional a Kansas commitment statute that required a finding of future dangerousness linked to a "'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior"); Demouchette v. Collins, 972 F.2d 651, 653-54 (5th Cir. 1992)

29

(noting that expert testimony in a death case claimed that an antisocial personality acts on impulse rather than deliberation and that a reasonable juror might find that this evidence had mitigating value in reducing moral culpability).

Finally, we must determine whether, because a defendant's diagnosed personality disorders complicate the task of determining whether his obstructive acts were "willful," the Government must show willfulness by a higher standard of proof than mere preponderance of the evidence. In support of this evidentiary standard, Greer points out that the Supreme Court has observed that it is still an open question whether "some heightened standard of proof might apply to sentencing determinations which bear significantly on the severity of sentence," Almendarez-Torres v. United States, 118 S. Ct. 1219, 1233 (1998), and that in the analogous situation of insanity issues, Congress requires courts to use the "clear and convincing" standard when making particular determinations, see 18 U.S.C. § 4243(e).

We can see no reason to deviate from the standard used in all other aspects of the sentencing process. Nor does the fact that at the time of Greer's crime, conviction, and sentencing, the application note to § 3C1.1 directed the district courts, "[i]n applying this provision in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the

defendant,"[7] help his case.  Although we never have interpreted this particular version of the application notes, we have interpreted a similar predecessor.  Before 1990, Application Note 2 to § 3C1.1 read: "In applying this provision, suspect testimony and statements should be evaluated in a light most favorable to defendant."  In <u>United States v. Franco-Torres</u>, 869 F.2d 797, 801 (5th Cir. 1989), we held that this provision did not require the sentencing court to believe the defendant's testimony; rather, it "simply instructs the sentencing judge to resolve in favor of the defendant those conflicts about which the judge, after weighing the evidence, has no firm conviction."  <u>But see</u> <u>United States v. Arnold</u>, 106 F.3d 37, 43-44 (3d Cir. 1997).  Our holding in <u>Franco-Torres</u> applies with equal force to the version of the application note in effect at the time relevant to Greer, for both require the district court to view allegedly false statements in the light most favorable to the defendant.  Our standard does not help Greer, however, because the district court in his case was firmly convinced that he was feigning mental illness.

---

[7]  Effective November 1, 1997, the Sentencing Guidelines were amended so as to delete "such testimony or statements should be evaluated in a light most favorable to the defendant" and inserting in lieu thereof "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  <u>See</u> U.S. SENTENCING GUIDELINES MANUAL app. C, amend. 564 (1997).  We need only consider the version of the Guidelines in effect at the time of Greer's sentencing.

*C. Did the District Court Err in Applying § 3C1.1 to Greer?*

We therefore review the district court's conclusion that Greer obstructed justice for clear error, keeping in mind that the Government need show, and the court need find, only by a preponderance of the evidence that Greer feigned incompetency in order to delay or avoid his trial. The district court did not clearly err. The Government's expert testified that although Greer suffered from antisocial and borderline personality disorders, he was capable of controlling his behavior. A quantity of other evidence supports the court's finding of willful malingering. For instance, Greer made false statements that he did not know his attorney; did not know what he was charged with; could not recite the alphabet; and could not tell what year it was. When told that his urinating out the slot of his cell door would fail to convince his doctors that he was incompetent and that successful malingering required that he urinate or defecate in his cell, he ceased urinating out the slot and began defecating in a corner of his cell. While he often conversed with non-medical personnel, he refused to speak to his doctors and tried to avoid being placed in housing where he could be observed easily. Although he claimed to benefit from anti-psychotic drugs, his behavior did not change when he stopped taking them. Finally, Dr. Richard Frederick of the Federal Medical Center at Springfield, Missouri administered a Forced

32

Choice Test to Greer, whose pattern of responses suggested that he was feigning psychosis.

The law, of course, requires not only that the defendant commit affirmative acts that tend to create an appearance of incompetency, but that he do so with the specific intent of obstructing justice. In this case, we have only circumstantial evidence of Greer's intent. We do not believe, however, that the Government must produce proof as direct and incontrovertible as, say, a tape recording of the defendant confessing his plan to feign incompetency in order to delay or avoid trial and punishment. On the other hand, we recognize that a determination by the district court, after a competency hearing, that a defendant is competent to stand trial often will entail a conclusion that the defendant's alleged mental illness is at least partially feigned, and we do not suggest that every instance of feigned mental illness justifies an enhancement for obstruction of justice. The district court may find from circumstantial evidence that the defendant engaged in a conscious and deliberate attempt to obstruct or impede the administration of justice. In this case, there was evidence that Greer engaged in a sustained pattern of appearing considerably more impaired than he was, and when he was told that certain actions would not convince the experts that he was in fact insane, he modified his behavior. The district court did not clearly err in finding that Greer willfully feigned mental illness in a conscious and

deliberate effort to delay, and perhaps avoid altogether, his day of reckoning on the grave offenses with which he was charged.

*D. Courtroom Behavior*

Greer also contends that the district court erred by using the obstruction of justice enhancement to increase his sentence rather than by simply citing him for contempt for his trial misbehavior. Our review of the record reveals, however, that the district court in fact viewed Greer's courtroom outbursts as a continuation of his attempt to feign incompetency. Moreover, Greer's willful attempt to feign incompetency prior to trial is sufficient to sustain the enhancement. We therefore need not decide whether § 3C1.1 may be used to sanction disruptive courtroom behavior that is not part of a sustained plan to feign incompetency.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM Greer's sentence.