**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 26, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 03-30916
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MAURICE RIEMER CALHOUN, JR,

Defendant-Appellant.

Appeal from the United States District Court
For the Western District of Louisiana

Before DAVIS, EMILIO M. GARZA, and PRADO, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Maurice Riemer Calhoun Jr. ("Calhoun") pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343 and one count of conspiracy to commit equity skimming in violation of 18 U.S.C. § 371, arising out of his rehabilitation and maintenance of affordable housing developments in Louisiana and Texas. The district court determined that Calhoun's total offense level was 24 and sentenced him to 60 months of imprisonment on each count, to be served concurrently. On appeal, Calhoun challenges the district court's application of the Sentencing Guidelines. He contends that

the district court erred in (1) its loss calculation under U.S.S.G. § 2F1.1; and (2) in assigning two points for obstruction of justice under U.S.S.G. § 3C1.1. We find that the district court applied the Sentencing Guidelines correctly and accordingly we affirm Calhoun's sentence.

I

Calhoun was charged with wire fraud based on his development of thirty-five distressed properties in Louisiana under the Low-Income Housing Tax Credit Program run by the Louisiana Housing Finance Agency ("LHFA"). The LHFA provides tax credits for investors in low-income apartment complexes to finance the development and rehabilitation of the complexes. The LHFA approves projects based on LHFA guidelines and monitors construction and related costs to insure that the projects comply with the program guidelines as established in the Qualified Application Plan ("QAP").

The QAP limits the developer's fee to a maximum of 15% of the costs of development *plus* 8% of the costs of acquisition of distressed properties. In addition, the builder is entitled to a profit of 8% of the costs of construction. If, however, there is an identity of interest between the developer and the builder, the developer is not entitled to both the 15% developer's and the 8% contractor's profit. The developer is limited to a developer's fee consisting of the 15% developer's profit plus the costs of acquisition. However, in order to gain bonus points for the competitive application selection process, a developer may agree to limit their developer's fee to 10% of the costs of development only.

As developer of the thirty-five distressed properties, Calhoun hired Ham Contracting Inc. ("HCI") as general contractor. Calhoun and HCI agreed that HCI would perform the construction on these properties and that the profits from the construction work would be diverted to Calhoun.

Calhoun did not, however, reveal this identity of interest to the LHFA, which enabled Calhoun to collect a larger overall fee. Calhoun also increased his overall fee by submitting fraudulent cost certificates which overstated costs and understated profits.

HCI diverted the contractor's profits and the overages from the inflated costs to Calhoun by purchasing gold coins, which were listed as assets of HCI. These coins were kept in safe deposit boxes under Calhoun's control at the Louisiana Coin Exchange. The district court found that the total excess profit gained by Calhoun as a result of the wire fraud was $2,463,995.

Calhoun also plead guilty to conspiracy to commit equity skimming based on loans he received from Rural Development for the acquisition and rehabilitation of forty-seven multi-family affordable housing units in Louisiana and Texas. Rural Development is an agency of the United States Department of Agriculture that lends money for the construction of rural low-income and elderly multi-family housing projects. The Rural Development loans are collateralized by reserve accounts maintained by the borrower that can only be used to meet necessary expenses of the property. In order to use the reserve accounts the borrower must submit reserve requests to Rural Development for approval.

Calhoun owned Calhoun Property Management, L.L.C., which acted as a manager for the partnerships that owned the housing complexes financed by the Rural Development loans. Calhoun decided to request reserve funds to make capital improvements on the various housing complexes. He directed an employee to submit reserve requests that exceeded the amount estimated to complete the repairs on the properties by approximately 130%. These reserve requests required the solicitation of at least three competitive bids prior to the release of funds. Calhoun, however, rigged the bidding process so that a construction company he controlled would always do the work. Calhoun then

diverted the undisclosed profits for his own use.

Calhoun submitted these fraudulent requests for at least 47 properties. Although Rural Development in Louisiana denied many of the request s as excessive, Rural Development in Texas approved eleven out of twenty-four reserve requests. The district court determined that the correct measure of the loss caused by Calhoun's fraud was the intended loss and not the actual loss. Accordingly, the district court considered all of Calhoun's fraudulent reserve requests, including those not approved, to determine that the intended loss from the equity skimming scheme was $1,106,303.62. When the loss from the wire fraud charge was added to the loss from the conspiracy to commit equity skimming count, it totaled $3,570,298.62. Under U.S.S.G. § 2F1.1, because the loss total was greater than $2.5 million, but less than 5 million, the district court enhanced Calhoun's sentence by thirteen points.

The district court also enhanced Calhoun's sentence by two points for obstruction of justice based on the following facts: Calhoun became aware of the government's investigation of him between mid-1999 and early 2000. During the course of his schemes, Calhoun had gold coins placed in three boxes at the Louisiana Coin Exchange. In May 2002, Calhoun asked his employee, Thomas Frye, to retrieve the gold coins from one of these boxes, numbered box 122. Before Frye arrived at the Louisiana Coin Exchange, however, Calhoun called to tell him that the government was already there drilling the boxes. The government found that boxes 120 and 121 were empty. Box 122, however, contained gold coins, which the government confiscated.

The following month, Calhoun visited his safe deposit box at Hibernia Bank in Mansfield, Louisiana. Shortly thereafter, he brought gold coins to his son's house in Louisiana and left them in a trash can outside the residence. His daughter-in-law subsequently moved the coins to her brother's

home.

II

Calhoun asserts that the district court erred in calculating his sentencing guideline loss under U.S.S.G. § 2F1.1. The calculation of the amount of loss is a factual finding, reviewed for clear error. *United States v. Sanders,* 343 F.3d 511, 521 (5th Cir. 2003). This means that the finding must be plausible in light of the record as a whole. *Id.*

Calhoun first contends that the district court's loss calculation was incorrect because it failed to take into account an 8% cost of acquisition fee to which he was legally entitled. During the competitive application process, however, in exchange for bonus points Calhoun agreed to limit his developer's fees to 10% of the Developer Fee Base. Calhoun thus relinquished any claim to the extra 5% of the Developer Fee Base and 8 % of the Acquisition Cost Base to which he normally would be entitled. Calhoun was not entitled to a fee consisting of 8% of the cost of acquisition of the distressed properties.

Calhoun also contends that the wire fraud guideline loss calculation should have taken into account the $355,653 in losses he sustained on certain of the rehabilitation projects. We need not address this argument, because even assuming that Calhoun is correct, reducing his loss by $355,653 would not effect his sentence range under § 2F1.1.

Calhoun also objects to the district court's calculation of the loss stemming from the conspiracy to commit equity skimming charge. He asserts that it was incorrect to use the gross amount of reserve funds that he requested from Rural Development instead of the amount actually approved by Rural Development to calculate the loss. The Sentencing Guidelines state that "[c]onsistent with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy), if an intended loss

that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1 cmt. n. 8. Intended loss is the appropriate measure of loss when the loss is "1) resulting from convictions for an 'Attempt, Conspiracy or Solicitation' to commit some other substantive offense which the Defendant was attempting to commit; 2) which is capable of being determined; and 3) is greater than the 'actual loss.'" *See Sanders,* 343 F.3d at 522.

Here, the intended loss should be used to determine Calhoun's sentence. First, the loss is a result of Calhoun's conviction for *conspiracy* to commit equity skimming. Second, the intended loss can be calculated based upon the amount of reserve that Calhoun initially requested. The reserves requested by Calhoun were not disbursed because of actions taken by Rural Development, not as a result of any action taken by Calhoun. The refusal to grant certain of Calhoun's requests did not impact Calhoun's intent to cause loss. *Cf. Sanders,* 343 F.3d at 514-15 (Actual loss was the appropriate measure of loss where a smaller loan was disbursed than initially requested when the defendant reduced the loan amount requested of his own accord). The intended loss in this case is commensurate with the amount of reserve funds Calhoun requested. Finally, the intended loss is greater than the actual loss as Rural Development did not approve all of Calhoun's reserve requests. The *Sanders* factors that determine when to use intended loss as the measure of loss have been satisfied. The district court thus correctly used the requested reserve requests to calculate the loss stemming from the equity skimming charge.

Calhoun also contends that the district court erred by enhancing his sentence for obstruction of justice under U.S.S.G. § 3C1.1. The district court gave three reasons for applying the obstruction of justice enhancement: (1) Calhoun requested that Frye remove the gold from safe deposit box 122; (2) Calhoun transported gold to New Orleans; and (3) Calhoun altered an employment agreement and

destroyed the computer on which it was made.

Section 3C1.1 provides for a two-point enhancement

> [i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct of impede, the administration of justice during the course of the investigation . . . and (B) the obstructive conduct related to (i) the defendant's offense of the conviction, and any relevant conduct; or (ii) a closely related offense.

U.S.S.G. § 3C1.1 (2000). Calhoun contends that he did not request that Frye remove the gold from safe deposit box 122 with the intent to obstruct justice.

We review the question of whether Calhoun acted with the intent to obstruct justice for clear error. *See United States v. Chavarria,* ___ F.3d ___ , 2004 WL 1551371 (5th Cir. July 12, 2004). The Government must show that Calhoun had the specific intent to obstruct justice by a preponderance of the evidence. *United States v. Greer,* 158 F.3d 228, 239 (5th Cir. 1998). The district court is permitted to use circumstantial evidence to find that Calhoun engaged in a conscious and deliberate attempt to obstruct or impede the administration of justice. *Id.* The district court may draw all reasonable inferences from the evidence. *See United States v. Khedr,* 343 F.3d 96, 102 (2nd Cir. 2003). Here, it was reasonable to infer that a request to remove gold coins that were purchased with the proceeds of a fraud during a pending investigation was done with the intent to obstruct justice. The obstruction of justice enhancement based on Calhoun's request that Frye retrieve the gold coins from safe deposit box 122 is supported by the evidence.[1]

The record also supports an obstruction of justice enhancement based upon Calhoun's transportation of gold from Mansfield to New Orleans. Although Calhoun claims that the transported

---

[1]The Sentencing Guidelines provided Calhoun with sufficient notice that the district court might enhance his sentence for obstruction of justice on the basis that he requested Frye retrieve the gold coins because Calhoun had actual knowledge of his request. *See United States v. Marmolejo,* 89 F.3d 1185, 1201 (5th Cir. 1996).

gold was unrelated to the charged conduct because it legitimately belonged to his wife, Marcia, the evidence shows that: 1) Calhoun transported gold from Mansfield to his son's residence in New Orleans; 2) Calhoun placed the gold in a trash can at the back of his son's house; 3) Calhoun's daughter-in-law then retrieved the gold from the trash and brought it to her brother's house; and 4) the gold was placed in a vacant room. The evidence also shows that the reason Calhoun placed the gold in a trash can outside his son's home was that his son did not want the gold in the house. This is strong circumstantial evidence that the transported gold was not legitimately owned. The Government met its burden to establish by a preponderance of the evidence that in transporting the gold to New Orleans Calhoun tried to obstruct justice by hiding his illegitimate gold. The two-point enhancement for obstruction of justice is supported by the evidence.[2]

AFFIRMED.[3]

---

[2]We need not address the district court's other basis for finding obstruction of justice, the creation of a false employment agreement and destruction of a computer, because the other two bases are sufficient to support the obstruction of justice enhancement.

[3]The appellee's motion to file a letter supplementing the argument made at oral argument is denied.