United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 18, 2003**

Charles R. Fulbruge III
Clerk

**Revised September 5, 2003**

**UNITED STATES COURT OF APPEALS
For the Fifth Circuit**

_____

No. 02-41514

_____

UNITED STATES OF AMERICA

Plaintiff-Appellee,

VERSUS

CECIL ALLEN SANDERS, JR.

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas

_____

Before EMILIO M. GARZA, DeMOSS, Circuit Judges, and DUVAL,[1]

District Judge.

DeMoss, Circuit Judge:

### INTRODUCTION

Defendant was convicted by a jury of bank fraud in violation of 18 U.S.C. §§ 1344 and 2, and for making a false statement to the Small Business Administration in violation of 15 U.S.C. §§ 645(a) and 2. He appeals claiming the evidence was insufficient to

---

[1] District Judge for the United States District Court for the Eastern District of Louisiana sitting by designation.

support his conviction, the district court erred in admitting certain evidence, and the district court erred in sentencing him. We affirm the jury verdict because the evidence is sufficient and the district court did not err in admitting any of the complained of evidence. However, because the district court erred in sentencing Sanders, we vacate the sentence and remand to the district court for re-sentencing.

### BACKGROUND

The facts established at trial are as follows. Cecil Allen Sanders, Jr. ("Sanders"), and his wife wanted to open a dry cleaning business. In order to finance the business, which they called Number One Cleaners, Sanders and his wife applied for a business loan in the amount of $232,000 from Plano Bank & Trust on September 5, 1996.

The loan Sanders applied for was 75% guaranteed by the Small Business Administration ("SBA"). Therefore, in order to obtain the loan, Sanders had to fill out SBA Form 413 as part of his application process. SBA Form 413 requires full and complete disclosure of current assets and liabilities.

In preparing his loan package, Sanders was referred to Centinal Financial Corporation by Plano Bank. Centinal is a company hired by Plano Bank to assist SBA loan applicants in preparing their loan applications for submission to Plano Bank. Centinal interviews the applicants and pre-qualifies certain loans

2

for approval by the bank. Chris Jones, a Centinal employee, reviewed Sanders's credit report, interviewed him, and helped him prepare SBA Form 413.

Sanders's credit report showed 28 credit card accounts and a high level of revolving credit. During the interview, Sanders told Jones that much of the credit card debt reflected on the report had been paid. As a result of Sanders's oral representations, Jones reported that Sanders's credit card debt was much lower than as reflected on the credit report. Jones testified that Centinal relies on the information provided by the borrower in making its recommendations to Plano Bank, and stated that he informed Sanders that Centinal was going to rely on the information he provided. Jones testified that he told Sanders that the bank would rely on SBA Form 413 when making its loan decision.

At trial, the government introduced evidence that during his interview with Jones, Sanders did not disclose that he had a substantial amount of unsecured obligations outside the representations he made to Jones. Specifically, Sanders owed Household Credit over $4,000, American Express Optima $3,500, Crestar Bank $4,000, AT&T Master Card $1,800, the Grantham Family $20,000, and Norma Boss $5,000.

The government also introduced evidence that Sanders misrepresented other information that led Plano Bank to think he was in better financial condition than he actually was. On page 3 of SBA Form 413, Sanders represented that he paid only $16,500 on

charge accounts for the year. He had actually paid significantly more. He had paid $16,000 to MBNA America and over $21,500 to Choice Visa. The information Sanders provided on Form 413 was used to calculate his cash flow. Sanders's cash flow was listed as $4,100, while it should have shown a deficit of $62,318.

Ken Lawless, a commercial loan officer working at Plano Bank who approved the loan, testified that if the bank had been aware that Sanders had a negative cash flow, it would have denied the loan.

After the $232,000 loan amount was approved, Sanders's purchase of the dry cleaners fell through because there were environmental problems at the location of the cleaners that was to be purchased. Sanders and his wife found a different dry cleaners to purchase for a lower price, which they also called Number One Cleaners. Sanders resubmitted his loan application but this time for a new loan of $77,500 from Plano Bank & Trust with an 80% SBA guarantee.

Prior to the funding of the second loan, on April 7, 1997, Sanders signed an affidavit stating that his individual and corporate financial position had not changed substantially since his application for the first loan, and that his SBA Form 413 information was still accurate. Maria Lagusis, the bank employee who closed on the loan, testified that in signing the affidavit, Sanders was certifying that all the information in his SBA Form 413 was accurate and that she reviewed this paragraph with Sanders to

4

make sure he understood what he was doing.

The new loan was disbursed in four installments. With each installment, Sanders completed an SBA Form 1050 in which he represented that there had been no substantial adverse change in his financial condition since he submitted his loan application.

In the meantime, Sanders's credit card and unsecured personal debt was mounting. By April 10, 1997, his debt was over $143,000. His undisclosed debt was $89,517 and his disclosed debt was $53,610. Special Agent Don Smiddy, of the United States Postal Inspection Service, showed the jury checks written and signed by Sanders around the dates of September 30, 1996, and April 10, 1997, payable to the credit card companies for debt Sanders did not disclose in his application or SBA Forms. This evidence was used to establish that Sanders was aware of this debt, but did not disclose it as an adverse change in his situation.

On October 8, 1997, Number One Cleaners filed for Chapter 7 Bankruptcy in the Northern District of Texas. Sanders had made three loan payments totaling $3,981, on the Plano Bank SBA guaranteed loan of $77,500. Four months later, on February 10, 1998, Sanders filed for personal bankruptcy in the Eastern District of Texas. In his personal bankruptcy, Sanders disclosed the credit card debt which he had not disclosed during the loan application process. The loan from Plano Bank was discharged in bankruptcy. After selling the assets of the cleaners, Plano Bank recovered $2,164.12, after deducting costs.

On February 13, 2002, a grand jury for the United States District Court for the Eastern District of Texas returned a two count indictment charging Sanders with bank fraud in violation of 18 U.S.C. §§ 1344 and 2, and for making a false statement to the Small Business Administration in violation of 15 U.S.C. §§ 645(a) and 2.

At Sanders's jury trial the government presented evidence demonstrating that Sanders had withdrawn a total of $21,659 from the Number One Cleaners bank account approximately 4 months before it went into Chapter 7 bankruptcy and did not disclose these withdrawals to the bankruptcy court. The district court gave a limiting instruction to the jury informing them that they could only consider the evidence to determine if Sanders had the requisite state of mind or intent to defraud, or whether he committed the acts by accident or mistake.

Sanders's defense at trial was that the documents he signed were vast and complicated. He testified that Jones and the other loan officers did not explain the documents to him. Additionally Sanders testified that he understood that the credit report would include all of his credit history. He also testified that he did not intentionally misrepresent anything to the bank. He stated that when he signed the affidavit, no one showed him the documents he had previously completed in order to determine if anything had changed.

On May 22, 2002, the jury found Sanders guilty as charged in

6

both counts of the indictment. Sanders was sentenced to a term of 21 months imprisonment on each count of the indictment to be served concurrently and was ordered to pay restitution in the amount of $76,767.69, and a special assessment totaling $200. Sanders was also ordered to serve concurrent terms of supervised release on each count: 5 years on count 1 of the indictment, and 1 year on count 2 of the indictment.

Sanders timely filed notice of appeal. On appeal he argues that the government did not prove that Plano Bank and Trust was FDIC insured and therefore the evidence is insufficient to support his bank fraud conviction. Sanders also argues that the district court erred in admitting some of the evidence that was presented at trial. Finally, Sanders claims the district court erred in sentencing him.

## DISCUSSION

**I. Whether the evidence presented at trial was sufficient to prove that Plano Bank and Trust was insured by the FDIC, thereby supporting Sanders's conviction for bank fraud.**

"In reviewing a challenge to the sufficiency of the evidence, we must determine whether a rational jury could have found that the evidence established guilt beyond a reasonable doubt on each element of the offense, drawing all reasonable inferences from the evidence and viewing all credibility determinations in the light most favorable to the verdict." *United States v. Solis*, 299 F.3d 420, 445 (5th Cir. 2002).

7

In Count One of the indictment, Sanders was convicted of bank fraud pursuant to 18 U.S.C. § 1344. We have held that proof of FDIC insurance is not only an essential element of the bank fraud crime, but it is also necessary for the establishment of federal jurisdiction. *United States v. Schultz,* 17 F.3d 723, 725 (5th Cir. 1994); *United States v. Slovacek,* 867 F.2d 842, 845 (5th Cir. 1989); *United States v. Trice*, 823 F.2d 80, 86 (5th Cir. 1987).

Sanders argues that the government offered insufficient evidence to establish that Plano Bank and Trust was FDIC insured. The government put on testimony from Ken Lawless, a former Plano Bank loan officer in charge of SBA loans, who was a loan officer during the time Sanders applied for a loan. Lawless testified that the bank was FDIC insured during the time in question. Sanders argues that this proof was insufficient because the government did not offer into evidence an insurance certificate, a cancelled check for the insurance premium, or any testimony as to Ken Lawless's basis of knowledge that Plano Bank & Trust was insured by the FDIC. Sanders contends that he specifically moved for judgment of acquittal on the grounds that the government failed to prove that Plano Bank was insured by the FDIC. The government counters that Sanders did not object to the testimony nor did he cross-examine Lawless on the issue. The government also argues that although Sanders made an oral motion for judgment of acquittal, the motion was based on defense counsel's erroneous belief that the government

8

had offered no proof of FDIC insurance, not merely insufficient proof. When the district court informed defense counsel that there had indeed been proof on this issue, defense counsel withdrew the motion, saying it was based on an erroneous belief. Defense counsel did not reurge his motion at the close of the evidence. The government argues that in light of Mr. Lawless's testimony, defense counsel's failure to cross-examine or object, as well as the lack of contradictory testimony, there was sufficient evidence to establish that Plano Bank had the requisite insurance.

We have held that the testimony of a bank officer is sufficient to establish that a bank is FDIC insured, especially when the testimony is not challenged on cross-examination. *United States v. Rangel*, 728 F.2d 675, 676 (5th Cir. 1984). Sanders argues that the instant case is distinguishable from *Rangel* because in *Rangel*, defense counsel conceded during argument that the financial institution was federally insured. *Id*. In the present case, however, after the initial objection, Sanders's counsel withdrew his motion for acquittal. Further, we have held that a defense counsel's "concession" is not necessary to finding that the testimony of a bank employee is sufficient to establish that a bank is FDIC insured. *Slovacek*, 867 F.2d at 845-46. Additionally, we have held that a showing of personal knowledge of FDIC insurance is not necessary if the testimony offered was unchallenged by opposing counsel. *Trice*, 823 F.2d at 87 n.6. Accordingly, the government

presented sufficient evidence to establish that Plano Bank and Trust was FDIC insured and therefore the jury verdict is affirmed.

## II. Whether the district court abused its discretion in admitting any of the complained of evidence and whether any errors are reversible.

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Guerrero,* 169 F.3d 933, 943 (5th Cir. 1999). If we find an abuse of discretion, we review the error under the harmless error doctrine. *United States v. Townsend,* 31 F.3d 262, 268 (5th Cir. 1994).

In his brief Sanders argues that the district court erred in admitting three items of evidence: 1) extrinsic evidence showing that Sanders did not disclose on his bankruptcy petition that payments were made to insiders within 1 year of the bankruptcy filing; 2) Sanders's testimony, which the prosecutor elicited on cross-examination, concerning his reneging on an agreement with a real estate agent and pocketing a refund check; and, 3) extrinsic evidence that Sanders filed a false worker's compensation claim.

First, the government offered into evidence testimony and exhibits showing that Sanders and his wife did not disclose, on their corporate bankruptcy petition, payments and reimbursements withdrawn from their corporate account within one year of the filing of their corporate bankruptcy petition. An instruction that the evidence concerning the bankruptcy petition could be considered only for the limited purpose of determining whether Sanders had the

10

state of mind or intent to commit the offense in the indictment, or whether he committed the acts for which he was on trial for by accident or mistake, was given to the jury.

Sanders argues the evidence had nothing to do with the allegations in the indictment and was offered solely to portray him as a liar. The government argues that this evidence was relevant to show Sanders's intent and that the bank fraud was committed in the absence of mistake or accident which is permissible under Fed. R. Evid. 404(b).[2]

The Fifth Circuit employs the two-prong *Beechum* test to examine the admissibility of extrinsic evidence under Rule 404(b). *Anderson v. United States,* 933 F.2d 1261, 1268 (5th Cir. 1991); *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978). The court must first determine that the extrinsic evidence is relevant to an issue other than the defendant's character, *i.e.*, motive, opportunity, intent, preparation, plan, knowledge, identity, or

---

[2] Rule 404(b) states that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).

11

absence of mistake or accident. *Anderson,* 933 F.2d at 1268. Second "the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403."[3] *Id.* at 1269 (internal quotation omitted).

In this case, it has been established that the government offered the evidence to prove intent and refute Sanders's claim of mistake or accident. These purposes are permissible under 404(b). Next, in order to find extrinsic evidence relevant to an issue other than character, the proponent must show that the evidence is of an offense that is similar to the charged offense. *Id.* The act of failing to disclose known information on the bankruptcy petition is similar to the act of failing to disclose known information on loan application forms and in light of the standard of review, which is abuse of discretion, the evidence is relevant under the first prong of the *Beechum* test.

As to the second prong of *Beechum*, the district court specifically stated at sidebar with the attorneys that the probative value of the evidence outweighed any prejudicial effect. Likewise, there are no other Rule 403 concerns. Additionally, the court gave a cautionary instruction to the jury. Under the Rule

---

[3] Rule 403 also requires that the evidence's probative value not be substantially outweighed by confusion of the issues, misleading the jury, consideration of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403.

403 standard, when the court issues a limiting instruction, it minimizes the danger of undue prejudice. *United States v. LeBaron*, 156 F.3d 621, 625-26 (5th Cir. 1998). Accordingly, the court did not abuse its discretion in admitting the evidence.

Second, testimonial evidence was introduced by the government when Sanders took the stand in his own defense. The prosecutor asked Sanders about reneging on an agreement with the real estate agent who sold Sanders's home. The prosecutor suggested that Sanders reneged on an agreement with the agent after Sanders received a partial refund of the agent's commission. Apparently Sanders accepted the refund but never bought the larger house from the agent as he allegedly agreed to do.

Sanders argues that this evidence was irrelevant and only establishes that there was a contract dispute between the real estate agent and Sanders. The government argues that Sanders took the stand and put his credibility at issue and the real estate transaction attacks Sanders's credibility, which is permissible under Rule 608.[4]

---

[4] Rule 608(b) states in pertinent part:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' [sic] credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' [sic] character for truthfulness or untruthfulness. . . .

When a defendant testifies, he puts his character for truthfulness in issue. *United States v. Waldrip*, 981 F.2d 799, 803 (5th Cir. 1993). Under Rule 608(b), the district court may determine if evidence is probative of truthfulness and under Rule 403 may exclude probative evidence if the prejudicial effect substantially outweighs the probative value. *Id.* Although Sanders argues that the incident is irrelevant because it was a mere contract dispute, the government alleges that Sanders committed fraud and cheated the real estate agent into giving him a refund. Fraud has been held to be probative of a witness's character for truthfulness or untruthfulness. *See, e.g., United States v. Mikolajczyk,* 137 F.3d 237, 244 (5th Cir. 1998). The evidence may have been prejudicial, but the district court found the probative value was not substantially outweighed by unfair prejudice. Therefore, the district court did not abuse its discretion in allowing the government to cross-examine Sanders regarding the transaction.

Third, the prosecutor also questioned Sanders about a worker's compensation claim Sanders submitted while he was working for the United States Postal Service. The government showed that the claim was fraudulent because Sanders worked for Number One Cleaners while he maintained a worker's compensation claim stating he was unable to work. Sanders testified on cross-examination that although he

Fed. R. Evid. 608(b).

14

worked at the cleaners, he did not haul any bags of dry-cleaning during the period of time he submitted his claim to the Postal Service stating he could not do physical labor. To contradict this testimony, the prosecutor introduced a videotape of Sanders hauling dry cleaning during the dates he informed the Postal Service that he was not working.

Sanders argues that evidence, specifically the videotape of Sanders hauling dry-cleaning, which the prosecutor offered to show that he committed worker's compensation fraud was inadmissible. The government asserts that it was admissible under several of the Federal Rules of Evidence.[5]

Again, we analyze the admission of this evidence under 404(b) utilizing the two-prong *Beechum* test for admitting evidence of prior bad acts. In relation to the first prong of the test, whether the evidence was relevant to any other issue besides Sanders's character, the government offered the videotape to prove, among other things, that the loan fraud like the false worker's compensation claim was not committed by accident or mistake. This is permissible under 404(b). Also, evidence of Sanders's failure to disclose something that was known, his working while claiming worker's compensation, is related to his failure to disclose his known debt on his bank loan application, tending to prove he acted

_____

[5] The government concedes, in its brief, that the evidence is inadmissible extrinsic evidence under 608(b) but argues it is admissible under the other rules.

with intent and not by mistake or accident.  As to the second prong of the test, again the court gave a limiting instruction and the prejudicial impact of this evidence was limited by Sanders, himself, raising the issue of the worker's compensation claim by arguing that the government was "out to get him" for submitting the claim.

Additionally, for any of the evidentiary rulings to be reversible error, the admission of the evidence in question must have substantially prejudiced Sanders's rights.  *See* Fed. R. Evid. 103(a); Fed. R. Crim. P. 52(a); *United States v. Lopez*, 979 F.2d 1024, 1034 (5th Cir. 1992).  Sanders has not alleged in his brief that the complained of errors have affected a substantial right.

Accordingly, the district court did not abuse its discretion in admitting the evidence of bankruptcy fraud, in allowing the government to question Sanders about the real-estate transaction, or in admitting evidence concerning the worker's compensation claim.  Additionally, if there were any errors, they were harmless and therefore the district court's evidentiary rulings are affirmed.

**III. Whether the district court clearly erred in sentencing Sanders.**

"The calculation of the amount of loss is a factual finding, reviewed for clear error." *United States v. Tedder*, 81 F.3d 549, 550 (5th Cir. 1996) (citation omitted). "In order to satisfy this clear error test all that is necessary is that the finding be plausible in light of the record as a whole." *United States v. Edwards*, 303 F.3d 606, 645 (5th Cir. 2002). However, the interpretation and application of the Guidelines is reviewed *de novo*. *United States v. Hill*, 42 F.3d 914, 916 (5th Cir. 1995).

**A.    *Loss Calculation at Sanders's Sentencing Hearing.***

The 1995 Sentencing Guidelines were used to calculate Sanders's sentence because there would have been an *ex post facto* problem if the 2002 guidelines, which were in effect on the date that Sanders was sentenced, were used. *See* U.S.S.G. § 1B1.11. The pre-sentencing report ("PSR") used U.S.S.G. § 2F1.1 to calculate the sentence for bank fraud under 18 U.S.C. § 1344 and making a false statement to the Small Business Association under 15 U.S.C. § 645(a). The PSR recommended that the two offenses be grouped together and counted as one offense for sentencing purposes because the counts involved the same harm. *See* U.S.S.G. § 3D1.2(d). The base offense level for "Fraud and Deceit" under 2F1.1 is 6. The PSR also recommended an increase of 2 offense levels because the offense involved more than minimal planning or a scheme to defraud

17

more than one victim.  *See* U.S.S.G. § 2 F1.1(b)(2).  This put the offense level at 8.

Section 2F1.1 provides that the offense level should be increased incrementally for losses that exceed $2,000.  The original PSR, using a loss amount of $77,500, the amount of the loan Sanders ultimately received, originally recommended increasing the offense level by 6.  The government objected to the PSR's use of $77,500 as the loss amount to calculate the offense level, arguing that the guidelines and case law required using $232,000 as the amount to calculate the offense level because that was the amount of loss Sanders intended to cause.  Without any hearing, the PSR was revised based on the government's objection; and, as presented to the judge, it recommended adding 8 levels to the offense, based on an intended loss amount of $232,000, increasing the total offense level to 16.  The PSR stated, the "actual loss in this case was $76,767.69; however, the intended loss was $232,000; It appears that Sanders intended to obtain the loan for, $232,000 but due to circumstances beyond his control, he did not."  Consequently, the revised PSR indicated the guideline range for imprisonment for Sanders's offense level was 21-27 months.

Sanders filed objections to the revised PSR, claiming among other things that the original PSR was correct in using the amount of $77,500 to calculate the offense level and corresponding sentencing range.  Sanders argued that sentencing based on the

$232,000 amount was improper because he intended to pay back the loan but, in fact never even received a loan for $232,000 and additionally that using the greater amount ignores the actual amount of the loss that remained after the payments were made and the collateral was sold.  Sanders also argued that according to the Sentencing Guidelines the greater amount should not be used because it overstates the seriousness of his conduct.

At the Sentencing hearing, Sanders again argued that the offense level should not be based on the $232,000 proposed loan amount but rather on the $77,500 actual loan amount minus any payments and cash received from the sale of the collateral.  The government argued for sentencing based on the loan amount of $232,000 which they argued was the loss Sanders intended to cause. The court did not state specifically why it found the loss amount to be $232,000 but it did adopt the findings of fact in the PSR; although, the PSR made no findings as to Sanders's intent other than the general statement that he intended to cause a loss of $232,000.   The court then sentenced Sanders to 21 months imprisonment, the minimum sentence under the guideline range for his offense level of 16.

### B.   Analysis of Indictment

In determining the correct amount of loss in this case, we must start with the counts of the Indictment which charge Sanders with the substantive offenses of bank fraud under 18 U.S.C. § 1344

19

and making a false statement to the Small Business Administration ("SBA") under 15 U.S.C. § 645. The Indictment does not charge a conspiracy or an attempt under either count, and there is no reference to 18 U.S.C. § 371 in the Indictment.

Paragraph 5 of the introduction section of Count 1 of the Indictment states as follows:

> 5. The "Number One Cleaners Loan," as that term is used in this Indictment, refers to a loan of $77,500, made on or about April 10, 1997, to defendant CECIL ALLEN SANDERS, JR. ("SANDERS") and his spouse by Plano Bank & Trust, for which loan the SBA guaranteed repayment to Plano Bank & Trust of up to 80% of the loan amount.

This defined term is first used in paragraph 8 of the Indictment which expressly charges that Sanders caused false information to be submitted to Plano Bank & Trust "in order to obtain the Number One Cleaners Loan." And similarly in paragraph 9 of the Indictment it charged that Sanders caused additional false information to be furnished to Plano Bank & Trust "in order to obtain the Number One Cleaners Loan." Furthermore, paragraphs 14 and 15 of the Indictment charge that "on or about April 10, 1997, in order to obtain $54,680.00 of the proceeds of the Number One Cleaners Loan, SANDERS caused an SBA Form 1050, Settlement Statement to be submitted to Plano Bank & Trust;" and on that same day "in order to obtain the proceeds of the Number [One] Cleaners Loan, SANDERS caused an Affidavit to be submitted to Plano Bank & Trust." Finally, in paragraph 2 of Count 2, the Indictment charges that Sanders made false statements as "described in paragraph 8 (a-

20

b) and 9-12 of Count 1 of [the] Indictment to the SBA for the purposes of influencing the action of the SBA in guaranteeing the Number [One] Cleaners Loan, and for the purpose of obtaining money under the Small Business Act."

There is no mention whatever in the Indictment of a proposed loan of $232,000 or of any attempt on Sanders's part to fraudulently "obtain" the proceeds of such proposed loan or of any actions which Plano Bank & Trust took in connection with any such proposed loan. It is apparent therefore that the offense of conviction under this Indictment related only to the actions of Defendant, Sanders, in connection with the "loan of $77,500.00 made on or about April 10, 1997 to Defendant Cecil Allen Sanders, Jr." Likewise the court's instruction to the jury did not mention in any way the relevance or significance of any proposed loan transaction involving $232,000.00.

**C.    *Loss Calculation in Fraudulent Loan Application Cases.***

The 1995 Guidelines state the following, concerning loss calculation in a fraudulent loan case:

> [T]he loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

> In some cases, the loss determined above may

21

significantly understate or overstate the seriousness of the defendant's conduct. For example, where the defendant substantially understated his debts to obtain a loan, which he nevertheless repaid, the loss determined above (zero loss) will tend not to reflect adequately the risk of loss created by the defendant's conduct. Conversely, a defendant may understate his debts to a limited degree to obtain a loan (e.g., to expand a grain export business), which he genuinely expected to repay and for which he would have qualified at a higher interest rate had he made truthful disclosure, but he is unable to repay the loan because of some unforeseen event (e.g., an embargo imposed on grain exports) which would have caused a default in any event. In such a case, the loss determined above may overstate the seriousness of the defendant's conduct. Where the loss determined above significantly understates or overstates the seriousness of the defendant's conduct, and upward or downward departure may be warranted.

U.S.S.G. § 2F1.1, comment. (n.7(b)).

We note that the term "intended loss" is not expressly defined anywhere in the Guidelines. The term is used earlier in the opening paragraph of Note 7 in a sentence which reads as follows:

Consistent with the provisions of §2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss.

U.S.S.G. § 2F1.1, comment. (n.7).

The phraseology of this sentence would seem to indicate that an "intended loss" is one: 1) resulting from convictions for an "Attempt, Conspiracy or Solicitation" to commit some other substantive offense which the Defendant was attempting to commit; 2) which is capable of being determined; and, 3) is

22

greater than "actual loss".

### D.   *Analysis of Loss Calculations in this case.*

The transcript of the sentencing hearing reflects that after hearing argument of counsel, the district court made the following rulings:

> THE COURT:  The court's understanding of the law in the 5th Circuit is that it's the intended loss and not the actual loss in circumstances such as this that governs.  And based on the evidence that the Court heard at the trial, the - - and what's contained in the presentence  report, the Court is persuaded that the Defendant intended to obtain a loan of $232,000, and that that was the intended loss.
>
> Also, recalling the evidence that I heard at the trial of this case, the Defendant's conduct with regard to the handling of the proceeds of the loan and his conduct with respect to the few payments that he made and the filing of bankruptcy, that the Court can find by a preponderance of the evidence, as required by the Quay case, that the Defendant did not intend to repay the loan.
>
> And the Court finds also from the evidence that the - - a reasonable effort was made to realize the maximum out of the collateral by the bank.
>
> I will say that the, as I recall, the program of making SBA loans by the bank left a little to be desired from the standpoint of monitoring the loans.
>
> So I will overrule your objection, Counsel, and now hear anything that you and Mr. Sanders have to say in mitigation of punishment.

There are no other findings of fact by the trial court in this record relating to its determination of the amount of loss.

The revised PSR, which the trial court made reference to in its ruling, contains the following provisions:

23

**16. Specific Offense Characteristics:** U.S.S.G. § 2F1.1(b)(1)(I) calls for an 8-level increase if the loss exceeded $200,000. The actual loss in this case was $76,767.69; however, the intended loss was $232,000; It appears that Sanders intended to obtain the loan for $232,000, but due to circumstances beyond his control, he did not. According to Application Note 7 to U.S.S.G. §2F1.1, if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. Therefore, the intended loss, $232,000, will be used to calculate the guideline range, and the offense level is increased by 8.

Likewise the addendum to the PSR contains the following provisions:

**DEFENDANT'S OBJECTION NO.3:** The defendant maintains a verbal objection to the revisions of the presentence report based on the Government's objections. In the original report, the guideline calculations were based on a loss amount of $77,500, the amount the defendant actually loaned. The Government argued, and the probation officer now agrees, that the intended loss should be used to determine the guideline range. the intended loss was the loan amount the defendant originally applied for, or $232,000. The defendant objects to this change.

**PROBATION OFFICER'S RESPONSE:** As stated in the Government's objection, the guidelines and case law support the use of the intended loss on which to base the guideline calculations. The probation officer was under the impression that it was the defendant's choice to terminate the sales contract with the seller of the first business that the defendant intended to purchase. According to the Government, the seller of that business would not sign a subordination agreement required by the bank; therefore Sanders was *forced* to terminate the sales contract. It appears that Sanders intended to obtain the loan for $232,000, but due to circumstances beyond his control, he did not. According to Application Note 7 to U.S.S.G. §2F1.1, if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. Therefore, the intended loss, $232,000, will be used to calculate the guideline range.

24

From these provisions in the PSR and Addendum thereto, it is apparent that the probation department determined the "actual loss" in this case was $76, 767.69.[6]  Likewise we note in its original report "the guideline calculations were based on a loss amount of $77,500, the amount the defendant was actually loaned."  When the Government objected to the use of $77,500 as the loss amount in the original report, the probation officer amended its PSR to use the $232,000 figure suggested by the Government.  In making this change, the probation officer made no additional findings of fact, but relied exclusively on the Government's interpretation that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."  We think the Government erred in proposing this rule to the probation office, the probation office erred in adopting this rule in its report, and the district court erred in utilizing this rule for the following reasons:

A.  As we pointed out earlier in this opinion, the defendant was not charged in the Indictment with any "attempt" to defraud Plano Bank & Trust and the substantive offense charged in the Indictment was the specific loan transaction in the amount of $77,500 which closed on April 10, 1997.

B.  The term "intended loss" as it appears in the last sentence of the first paragraph of Application Note

---

[6] We note that under Paragraph 57 of the Presentence Report, it recommended restitution in this same amount (actual loss). The victims, Plano Bank & Trust and the SBA, have raised no objection to the accuracy of this amount and did not contend in any way that they had any "loss" arising out of the proposed loan of $232,000.

25

7(b) of U.S.S.G. § 2F1.1 (1995) is an obvious cross reference to the term "intended loss" as it appears in the opening paragraph of Application Note 7 which states:

> "Consistent with the provisions of 2X1.1(Attempt, Solicitation or Conspiracy) if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."

U.S.S.G. § 2F1.1, comment. (n.7).

C.    Absent an indictment count which charges an "attempt" to defraud, the term "intended loss" has no applicability to the determination of "loss" in this case.

D.    We think the Government, the probation officer and the trial court erred in considering and finding the amount of a loan which a defendant <u>received</u> or intended to receive as a factor in determining "intended loss." *See United States v. Quaye*, 57 F.3d 447, 448 (5th Cir. 1995) (stating that a finding as to the amount the defendant received or intended to receive was not sufficient to prove the amount of the intended loss).

We think the probation officer got it right the first time in using "actual loss" as the loss amount for purposes of increasing the offense level under § 2F1.1 (1995). The first sentence of Application Note 7(b) expressly states: "In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss)." U.S.S.G. § 2F1.1, comment. (n.7(b)). The $77,500 loan on April 10, 1997, was fully funded and the circumstances which precipitated the need to determine "actual

26

loss" had all occurred. There was therefore no need to try to estimate "expected loss" within the meaning of this first sentence.

In effect, what the Government persuaded the trial court to do was to pretend that there was a count in the Indictment which charged Sanders with an attempt to defraud Plano Bank & Trust of $232,000. Even if that had been the case, however, we are not persuaded that the Government would have met its burden of proving by a preponderance of the evidence, that Sanders did not intend to repay any portion of the proposed $232,000 loan.

### E. Parties' Contentions of an Intent to Repay

Sanders contends that there is no evidence that he intended to not repay the loan. He argues that the district court failed to consider the following facts which support his argument that he purchased Number One Cleaners with every intention of operating it. First, he made three payments on the loan which he claims shows his intention to repay the loan. Second, he actually operated the cleaners, including putting time and money into fixing some obsolete equipment. Third, both the proposed loan amount of $232,000, and the actual loan of $77,500 were secured by collateral, and he had no involvement in the appraisals of the collateral for the original loan or the modified loan.

Sanders asserts that because he intended to repay his loan, the district court should not have used the intended loss in calculating the sentence, but should have used the actual loss.

27

Sanders maintains that the actual loss was $71,354.88: $77,500 minus the three payments made on the loan, $3,981.00, and minus the $2,164.12 the bank realized on the sale after liquidating the collateral on the loan. The actual loss amount of $71,354.88 would have resulted in an offense level of 14, and his imprisonment sentence would have fallen within the 15-21 month range instead of the 21-27 month range. *See* § 2F1.1 and § 5A. The 15-21 month range is consistent with the sentencing range and offense level originally recommended in the PSR.

All the evidence that the government argues as supporting the district court's finding of no intent to repay, does not make the finding plausible but actually supports Sanders's claim that he intended to repay the loan or at the very least he never intended to not repay $232,000, an amount he never received.[7]

---

[7] We have reviewed the entire record for all evidence that "plausibly" supports the district court's finding, even evidence the Government did not cite in its brief, despite our requirement that the appellee's brief must contain citations to "parts of the record relied on." Fed. R. App. P. 28(a)(4); Fed. R. App. P. 28(b). Further, the government in its brief argues that "there is no credible evidence in the record that Sanders intended to repay the loan." This argument, however, misstates the burden, it is the government that had to prove by a preponderance of the evidence that Sanders intended to not repay the $232,000 loan, and the absence of evidence indicating Sanders's intent to repay is not the same thing as the presence of evidence indicating his intent not to repay. We note however that under the provisions of the original loan commitment for the $232,000 loan, Sanders and his wife were obligated to sign a personal guarantee of their corporation's promissory note to Plano Bank & Trust; and in anticipation of closing such loan, Sanders and his wife had actually signed such guarantee. Neither the prosecutor, nor the probation officer, nor the trial court gave any consideration to

First, the government argues Sanders's failure to disclose the extent of his debt when applying for the loan is proof that he intended to not repay the loan. Sanders's failure to disclose known debt is the conduct for which he was convicted of bank fraud, but, this does not in-and-of-itself make plausible the assertion that he intended to not repay either all or part of the $232,000.

Second, the government argues that Sanders's financial situation worsened from the time when he originally applied for the proposed $232,000 loan to the time when he received the $77,500 loan and this meant his ability to repay the loan lessened and therefore he intended to not repay the loan. Using the government's own logic that ability to repay is relevant to intent, if this evidence indicates anything it is that Sanders's ability to repay was greater when he applied for the $232,000 and therefore he was less likely to have the intent to not repay the loan at that time.

Third, the government argues that the timing of the bankruptcy filing, approximately four months after the final disbursement of the $77,500 loan, indicates Sanders never intended to repay the $232,000. The apparent close timing of Sanders's filing for bankruptcy and the final disbursement of the $77,500 loan does not prove, or even tend to prove, that he intended not to repay the loan of $232,000 which was never funded and which he never

this fact in determining the issue of intent to repay.

29

received.

Fourth, the government argues that the collateral that was to be used to secure the $232,000 loan was inadequate and that this indicates Sanders had the intent to not repay the $232,000. Our case law indicates that if the defendant has no ownership interest in or control over the collateral used to secure the loan, then the loss calculation amount does not need to consider the value of the collateral. *United States v. Morrow*, 177 F.3d 272, 300 (5th Cir. 1999); *Tedder*, 81 F.3d at 551; *Hill,* 42 F.3d at 919. In the present case, unlike the cited cases, Sanders has always maintained, and the government conceded in its appellate brief that, he had nothing to do with the valuation of any collateral. Further, there is no evidence Sanders attempted to deceive the bank concerning the collateral. Without more evidence concerning Sanders's role in securing the loan with the collateral, the ultimate inadequacy of the collateral does not prove Sanders had the intent to not repay the $232,000, an amount he never received.

Fifth, the government argues that because Sanders made only three loan payments on the $77,500 loan, this is evidence of his intent to not repay the $232,000 loan. The government's argument concerning this evidence makes no sense.

Sixth, the government's final argument is that Sanders withdrew over $20,000 from the corporate account prior to the bankruptcy and did not declare this on the bankruptcy petition and

30

this is evidence of his intent to not repay the $232,000 loan. The record is unclear as to what the withdrawn funds were used for; Sanders maintains that he never pocketed any of the loan money but rather used it in trying to make the dry cleaners work. With nothing more than the mere withdrawal, it is not plausible that this evidence along with the government's other evidence establishes by a preponderance of the evidence that Sanders intended to not repay $232,000, an amount he never received; it could plausibly be evidence of intent concerning the $77,500 loan, but Sanders was not sentenced based on that loan amount.

Finally, while several cases in this Circuit have sentenced the defendant based on the intended loss when the actual loss was less, those cases all include facts not present in this case. *Morrow*, 177 F.3d at 300; *Tedder*, 81 F.3d at 551; *Hill,* 42 F.3d at 919. In *Morrow*, *Tedder*, and *Hill*, there were facts in the record that indicated the defendants' intent not to repay the greater amount regardless of the fortunate circumstances of the actual loss being less. Also, unlike the defendants in the other cases, Sanders never received all or any part of the $232,000, the amount the government argues is the intended loss here. He never even attempted to receive this amount after the original property he wanted to purchase was unavailable; but rather, he found a new property and received a new loan for $77,500. In fact, we are unaware of any case in this Circuit with facts similar to this case

31

in which the defendant was sentenced based on a proposed loan of a greater amount which preceded an actual loan of a lesser amount. Although it may be theoretically possible to intend a loss that is greater than the potential actual loss, our case law requires the government prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level. *Tedder*, 81 F.3d at 551; *Henderson*, 19 F.3d at 928. In other words, in the absence of facts indicating an intent not to repay the loan, the actual loss must be used to calculate the defendant's offense level. U.S.S.G. § 2F1.1, comment. (n.7(b)); *see also Henderson*, 19 F.3d at 928. Unless there is evidence concerning Sanders's intent that we are not aware of, both the Sentencing Guidelines and our case law require that the actual loss Sanders caused be determined and that he be sentenced accordingly.

We have concluded that one of the clear errors which the prosecution made and the probation officer adopted and thereby lead the district court into error, was the assumption that the $77,500 loan transaction was simply part and parcel of the earlier proposed loan of $232,000. From our review of the record, however, we are satisfied that these two transactions were separate and distinct. The loan commitment for the $232,000 clearly contemplates that such loan would be "secured by a first lien on all accounts receivable, supplies, inventory, work in progress, furniture and equipment,

32

vehicle and leasehold improvements located at 8014 Spring Valley, 1505 Commerce, and 14651 Dallas Parkway, Dallas." This loan was to enable the defendant's corporate entity, "Number One Cleaners Inc.," to purchase the assets and property on which the first lien was to be given to the bank. During the process of preparing for closing of this acquisition and loan, it was discovered that certain environmental problems existed at one of the plant locations and the landlord refused to sign a subordination agreement. As a result the contract which Sanders had to purchase these properties was "declared null and void." Obviously, if the contract to purchase was "null and void," the loan commitment for the $232,000 loan was similarly no longer enforceable and the Bank did not fund any portion of the $232,000 for the purposes stated in the loan agreement. With the help of a broker, Sanders located another property which Sanders could use to get into the dry cleaning and laundry business. In this second transaction the assets and properties, which defendant would acquire and could then give a first mortgage to the bank upon, were entirely separate and different from those contemplated in the $232,000 proposed transaction. The bank agreed to lend the defendant $77,500 to effectuate this new acquisition and the previous loan commitment to lend $232,000 was "modified" to limit the loan amount to $77,500.

In our view once the "loan package" was modified to limit the loan amount to $77,500, there was no legal basis upon which the Bank would be at risk to loan any amount of money more than

33

$77,500; and if the Defendant were ever determined to have any intention not to repay the Bank, such intentions would only exist as to the sum of $77,500. This new loan was closed and fully funded in four loan disbursements totaling $77,500, the first of which was made on April 10, 1997, in the amount of $58,000.

We realize that clear error is a deferential standard of review; however, it is more than a rubber stamp. Therefore, we find that the district court clearly erred in finding that the government proved by a preponderance of the evidence that Sanders intended to not repay the $232,000 loan. Additionally, because the record indicates that the district court considered that Sanders had no criminal history and had served in the military and therefore sentenced Sanders to the minimum sentence within the guideline range for a level 16 offense, the error was not harmless. *See United States v. Ahmed*, 324 F.3d 368, 374 (5th Cir. 2003) (citations omitted).

Accordingly, we vacate Sanders's sentence and remand to the district court for re-sentencing. When re-sentencing Sanders, the district should use actual loss and not intended loss to determine Sanders's offense level and sentencing range.

## CONCLUSION

Having carefully reviewed the record of this case, the parties' respective briefing and arguments, for the reasons set forth above, we affirm the jury verdict and the evidentiary

34

decisions of the district court. However, we vacate Sanders's sentence and remand the case for re-sentencing consistent with our instructions herein.

**Affirmed in part, Vacated in part, Remanded in part.**

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

A man walks into a bank to apply for a $232,000 loan. A bank loan officer hands the man a form, which requires the man to disclose his assets and liabilities. The man stares at the form, pondering his recent debts and cash flow problems: $4,000 owed to a different bank; $9,300 owed to assorted credit card companies; approximately $25,000 owed to friends; and a cash flow deficit of over $60,000. This man has not seen "black" in his credit report for quite some time. The man presumes that the bank will not look too kindly on this financial situation, so he "fudges" a bit on the loan application. He neglects to report many of his debts, states that he has a positive cash flow, and hands the form back to the bank loan officer.

Looking at this picture, do we think that this man believes he can pay back a $232,000 loan? More to the point, is it "plausible" to conclude that this man does not believe he can repay the loan, and therefore does not intend to repay it? Of course it is.

The district court in the instant case was presented with a set of facts almost identical to the above scenario. Based on that (and other) evidence, the court concluded, plausibly enough, that Cecil Allen Sanders ("Sanders") did not intend to repay a $232,000 loan from Plano Bank and Trust ("the Bank"). The majority opinion, however, asserts that the district court *clearly erred* in making

36

this determination.  For that reason, the majority opinion holds that the district court erred in using the $232,000 figure to determine Sanders's sentence.  Although I agree with much of the majority opinion (the part that affirms Sanders's conviction), I cannot concur in the opinion's decision to reverse Sanders's sentence.

The majority opinion rests its conclusion that the district court erred in sentencing Sanders on two separate grounds.  First, the majority opinion holds that the district court could not consider the $232,000 loan at all, because the Government did not include this loan in Sanders's indictment.[8]  Second, the majority opinion concludes that the district court clearly erred in using the $232,000 figure to calculate Sanders's sentence because the evidence shows that Sanders intended to repay the loan.  Neither conclusion, in my view, can be reconciled with our precedent.

I

The present case involves the district court's application of Sentencing Guideline § 2F1.1.  That provision states that a district court should increase the sentence of a defendant who has

_____

[8] As the majority opinion recites, Sanders never in fact received the $232,000 loan.  Sanders requested the money to purchase a dry cleaning establishment, and the Bank approved the loan.  At the last minute, however, the seller pulled out of the deal, because of environmental problems with the facility. Sanders later found a second (and less expensive) dry cleaning business, and applied for another loan. The Bank approved a $77,500 loan, again relying on Sanders' claims that his finances were stable.  Sanders's indictment for bank fraud referred specifically to this second loan.

37

committed certain crimes (including bank fraud) in proportion to the financial loss caused by the defendant. *See* U.S. S‌ENTENCING G‌UIDELINES M‌ANUAL § 2F1.1(b)(1). For purposes of this guideline, the relevant "loss" is generally the actual or expected loss to the victim. *Id.*, cmt. n. 7(b). However, § 2F1.1 provides that "where the intended loss is greater than the actual loss, the intended loss is to be used." *Id.* In the present case, the district court found, by a preponderance of the evidence, that Sanders did not intend to repay the $232,000 loan. Therefore, the court found, as a matter of fact, that Sanders intended to cause a loss of $232,000. The court concluded that this figure was greater than the actual loss caused by Sanders (which, according to the presentence report was $76,767.69), and therefore calculated Sanders's sentence based on this $232,000 intended loss.

The majority opinion concludes that the district court erred in using the $232,000 figure to determine Sanders's sentence. The majority opinion bases this conclusion in part on the fact that there was no reference in Sanders's indictment to the $232,000 loan. The opinion thereby appears to assert that, when the district court calculates a defendant's sentence pursuant to § 2F1.1, the court can never consider offenses beyond those charged in the indictment.

The majority opinion's assertion is surprising. We have repeatedly reaffirmed that, when a district court sentences a

38

defendant, the court can take into account offenses that were not specifically included in the indictment. *See, e.g.*, *United States v. Anderson*, 174 F.3d 515, 526 (5th Cir. 1999) ("It is not necessary for the defendant to have been charged with or convicted of carrying out the other acts before they can be considered relevant conduct [for sentencing purposes]."); *United States v. Singleton*, 946 F.2d 23, 26 (5th Cir. 1991) ("[A] court, when considering the appropriate sentence under the guidelines, can consider not only crimes that have not been proven beyond a reasonable doubt, but crimes that have not even been charged."); *see also United States v. Powell*, 124 F.3d 655, 666 (5th Cir. 1997) (concluding that, in determining a defendant's sentence for federal tax violations, the district court could consider not only the amount of federal tax losses but also the amount of state tax losses, because the latter constituted "relevant conduct"); *cf. United States v. Carreon*, 11 F.3d 1225, 1241 (5th Cir. 1994) ("A district court may base a defendant's sentence on conduct for which the defendant was acquitted because the government need only establish sentencing facts (unlike the elements of the crime) by a preponderance of the evidence.").

Indeed, we have applied this rule in the § 2F.1.1 context. *See Anderson*, 174 F.3d at 526 (rejecting the defendants' assertion that "the district court erred in calculating the amount of loss attributable to them [under § 2F1.1], and thus their base offense

39

levels, because the district court included conduct not charged in the superseding indictment as relevant conduct pursuant to U.S.S.G. § 1B1.3"); *see also United States v. Burridge*, 191 F.3d 1297, 1304–05 (10th Cir. 1999) (rejecting the defendant's assertion that the district court erred in calculating his sentence under § 2F1.1 because the district court included conduct that was not charged in the indictment); *United States v. Dickler*, 64 F.3d 818, 831 (3d Cir. 1995) (stating, in reviewing the district court's calculation of loss under § 2F1.1, that "[t]he relevant criminal conduct need not be conduct with which the defendant was charged, nor conduct over which the federal court has jurisdiction") (citations omitted).

That is not to say, of course, that the district court can consider *any* conduct beyond that charged in the indictment to determine a defendant's sentence. The district court can consider only prior acts that satisfy two conditions. The conduct must (1) be criminal and (2) qualify as "relevant conduct" under Sentencing Guideline § 1B1.3. *Anderson*, 174 F.3d at 526; *Powell*, 124 F.3d at 665; *see also United States v. Sotelo*, 97 F.3d 782, 799 (5th Cir. 1996) ("The Sentencing Guidelines allow the sentencing court to hold a defendant accountable for all relevant conduct.").

The majority opinion surely would concede that Sanders's conduct in applying for the $232,000 loan was criminal. As the majority opinion recounts, Sanders submitted the same loan

application for the initial $232,000 loan and the $77,500 loan that he ultimately received. Sanders's failure to report all of his debts and liabilities on *that* loan application was the "conduct" that led to his convictions for bank fraud and for making false statements to the Small Business Administration ("SBA"). In affirming those convictions, the majority opinion clearly recognizes that Sanders's conduct in filling out the loan application (for both the $232,000 loan and the $77,500 loan) was "criminal."

Therefore, the question of whether the district court could consider the $232,000 loan at sentencing turns on whether it qualifies as "relevant conduct" under § 1B1.3. Under that provision, "relevant conduct" includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(a)(2). The commentary to § 1B1.3 further explains that, in order for two offenses to constitute part of a "common scheme or plan," they must be "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *Id.*, cmt. n.9(A); *Anderson*, 174 F.3d at 526; *Powell*, 124 F.3d at 665.

It is not difficult to recognize that Sanders's conduct constitutes the quintessential example of a "common scheme or plan." Sanders' efforts to obtain the $232,000 and $77,500 loans

41

involved most, if not all, of the above criteria: "common victims" (the Bank and the SBA); "common purpose" (to obtain funds to purchase a dry cleaning business); and "similar *modus operandi*" (submitting *the same* falsified loan application form). Therefore, Sanders's application for the $232,000 loan constitutes "relevant conduct," and was properly considered by the district court at sentencing.[9]

## II

The majority opinion next asserts that the district court should not have used the $232,000 figure, because the Government failed to prove by a preponderance of the evidence that Sanders did not intend to repay the loan. The majority opinion concludes that, because Sanders intended to repay the loan, the district court should not have used Sanders's "intended loss" at all. Instead, the court should have calculated his sentence based on the "actual loss" that he caused. *See United States v. Tedder*, 81 F.3d 549, 551 (5th Cir. 1996) ("Where the defendant intends to repay the loans, then actual loss, rather than intended loss, is the appropriate basis for calculating loss under §2F.1.1."); *United States v. Henderson*, 19 F.3d 917, 928 (5th Cir. 1994) ("If [the defendant] intended to repay the banks on his loans, the district

---

[9] Indeed, it might have been error for the district court *not* to consider the $232,000 loan. *See United States v. Bennett*, 37 F.3d 687, 694 (1st Cir. 1994) (concluding that the district court erred in calculating the amount of loss under § 2F1.1 because the court failed to include all "relevant conduct").

court should not have used intended loss as the basis for sentencing.").

The majority opinion purports to recognize that the calculation of loss under § 2F1.1 is a factual finding that this Court reviews for clear error. *See United States v. Morrow*, 177 F.3d 272, 301 (5th Cir. 1999) (noting that "[t]he district court's calculation of loss under § 2F1.1 is a finding of fact reviewable only for clear error"); *Tedder*, 81 F.3d at 550; *United States v. Hill*, 42 F.3d 914, 919 (5th Cir. 1995). The majority opinion also appears to acknowledge that the district court's determination that Sanders did *not* intend to repay the $232,000 loan was a finding of fact, subject to review only for clear error.

Indeed, the majority opinion even recites the very deferential nature of our review in § 2F1.1 cases. As the majority opinion states, we affirm the district court's sentencing determination as long as the court's findings of fact are "*plausible* in light of the record as a whole." *United States v. Edwards*, 303 F.3d 606, 645 (5th Cir. 2002) ("In order to satisfy this clear error test all that is necessary is that the finding be plausible in light of the record as a whole.") (internal quotation marks omitted) (emphasis added); *see also United States v. Lopez*, 222 F.3d 428, 437 (7th Cir. 2000) ("The burden of proof on appealing a district court's loss calculation requires the defendant to show that the determination was *not only inaccurate but outside the realm* of permissible computations.") (internal quotation marks omitted)

43

(emphasis added).

The majority opinion, however, after reciting the proper standard, then goes on to apply anything but clear error review. The opinion does not (in accordance with a clear error standard) examine the evidence as a whole to determine whether that evidence might support the district court's factual finding. *Cf. Morrow*, 177 F.3d at 301 ("Given this [clear error] standard of review, the only question we must address is whether the record supports the district court's determination that the defendants did in fact intend to inflict a loss in the total amount of the fraudulently obtained loans."). Instead, the majority opinion (in accordance with a *de novo* standard) examines each piece of evidence separately, explaining why that evidence—standing alone—cannot support the district court's decision.[10] The majority opinion thereby effectively turns a clear error standard of review into a *de novo* standard.

A single example illustrates this point. The majority opinion examines the Government's contention that Sanders's failure to disclose his financial problems on his loan application indicates a lack of intent to repay the debt. The opinion rejects this

---

[10] Indeed, much of the discussion in the majority opinion seems more concerned with explaining the fallacies in the Government's arguments than with determining whether the evidence supports the district court's decision. The fact that some of the Government's contentions "make[] no sense" may indicate that the Government should spend more time refining its arguments, but does not suggest that there is no evidence to support the district court's factual determination.

44

argument, stating that "Sanders failure to disclose known debt . . . does not in-and-of-itself make plausible the assertion that he intended to not repay either all or part of the $232,000." The majority opinion mischaracterizes the question before this Court. The issue is not whether a particular piece of evidence "in-and-of-itself" supports the district court's decision. Instead, the question is whether that evidence, in light of the record as a whole, supports the district court's factual determination that Sanders did not intend to repay the debt. *See Edwards*, 303 F.3d at 645; *cf.* FED. R. EVID. 401 (noting that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

If the majority were to examine the above evidence in light of the record as a whole, as we must under the clear error standard of review, the majority would see that the district court's determination was indeed "plausible." The evidence at trial showed that Sanders was well aware of his precarious financial condition; for that very reason, he intentionally hid his financial problems from the Bank when he applied for the loan. That evidence would support a conclusion that, when Sanders applied for the loan, he did not believe he would be able to repay the debt (and, thus, did not intend to repay the debt). The evidence at trial also suggested that Sanders was not particularly honest or forthcoming with respect to financial matters. Not only did he make material

45

misrepresentations on his bank loan applications, but he also failed to disclose information on his bankruptcy petition.[11] That evidence could have led the district court to discount Sanders's representations that he did in fact intend to repay the loan. In sum, the district court could have inferred from Sanders's pattern of dishonesty in financial transactions, combined with Sanders's clear awareness of his own financial troubles, that when Sanders applied for the $232,000 loan, he did not believe he could (and did not intend to) repay the debt.

The evidence produced at trial, when viewed as a whole, indicates that the district court's determination (that Sanders did not intend to repay the $232,000 loan) was at least plausible. Indeed, in my opinion, the evidence suggests that the district court's factual finding was correct. As a result, the district court properly used the $232,000 figure to determine Sanders's sentence.

The majority opinion presents no valid reason for reversing the district court's sentencing determination in this case. Therefore, I respectfully dissent.

---

[11] In addition, the evidence suggested that Sanders may have filed a fraudulent worker's compensation lawsuit.