UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-4430

UNITED STATES OF AMERICA,

            Plaintiff - Appellee,

      v.

TIMOTHY RAY CLINE,

            Defendant - Appellant.

Appeal from the United States District Court for the Southern
District of West Virginia, at Bluefield.    David A. Faber,
District Judge.  (1:06-cr-00161-1)

Argued:  March 27, 2009                Decided:  June 9, 2009

Before MICHAEL and TRAXLER, Circuit Judges, and Thomas D.
SCHROEDER, United States District Judge for the Middle District
of North Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** John Miles Morgan, Charleston, West Virginia, for
Appellant.  Larry Robert Ellis, OFFICE OF THE UNITED STATES
ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF:**
Dwane L. Tinsley, HENDRICKSON & LONG, PLLC, Charleston, West
Virginia, for Appellant.   Charles T. Miller, United States
Attorney, Charleston, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Timothy Ray Cline pled guilty to one count of tax evasion under 26 U.S.C. § 7201 and one count of Social Security fraud under 42 U.S.C. § 408(a)(4). He appeals his sentence, contending the district court erred in calculating his sentence and made incompatible findings of fact. Finding no error, we affirm for the reasons stated below.

I.

From September 1991 to March 2003, Cline received Social Security Disability Insurance Benefits ("DIB") in amounts ranging from $761 to $1,370 a month, based on a prior determination that he suffered from qualifying disabilities.[1] J.A. 973. From February 1995 to March 2003, Cline received payments totaling $35,622. J.A. 13-14.

In 1993, Cline started a chain of nightclubs and adult entertainment establishments in southern West Virginia which he owned, operated and managed through a number of interrelated corporate entities operating generally under the name "Southern X-posure." J.A. 941-49, 953-64. Although he did not draw a regular salary or wage from any of his companies, he regularly appropriated the cash door revenue, or "cover charge," collected

---

[1] Cline became entitled to DIB in September 1991 with a primary diagnosis of degenerative joint disease and a secondary diagnosis of depression. J.A. 973.

2

at the nightclubs. J.A. 941, 958. From 2001 through 2003 alone, Cline drew an estimated $200,000. (Id.) Neither Cline nor any of his companies reported this income to the Internal Revenue Service ("IRS"). J.A. 971.

Following the filing of an Information, Cline pled guilty pursuant to a plea agreement to federal income tax evasion, in violation of 26 U.S.C. § 7201, and Social Security fraud, in violation of 42 U.S.C. § 408(a)(4). J.A. 11-14.

During a three-day sentencing hearing, Cline pursued a previously filed Motion for Downward Departure Based on Diminished Capacity under U.S. Sentencing Guideline ("USSG" or "Guidelines") § 5K2.13.[2] Cline presented the expert testimony of Dr. Robert Miller, a forensic psychiatrist, and Timothy Saar, Ph.D., a treating psychologist. Dr. Miller had administered a series of psychiatric and psychological tests to determine Cline's mental capacity, and Dr. Saar had treated Cline for substance abuse. Based on their interaction with Cline and, in part, on their independent review of Cline's medical history predating the offenses, both Drs. Miller and Saar testified that Cline suffered from mental and emotional conditions supporting a finding of the diminished capacity required for a downward departure. J.A. 86, 194-98, 878. Cline refused to submit to an

---

[2] Cline was sentenced pursuant to the Guidelines in effect on November 1, 2007.

3

examination by Dr. Ralph Smith, the Government's expert, who testified that certain of Cline's test results indicated that he had inflated and falsified symptoms during his testing and, consistent with Cline's medical history, that he had a high probability of malingering. J.A. 435-40, 458, 482, 489, 493, 495, 919, 922-23.

The district court denied Cline's motion and, instead, applied a 2-level enhancement under USSG § 3C1.1 for obstruction of justice, based on its finding that Cline had willfully manipulated his test answers in an attempt to demonstrate he possessed the diminished mental capacity necessary to obtain a downward departure. J.A. 1078. The district court also declined to apply a reduction for acceptance of responsibility under USSG § 3E1.1. J.A. 1076.

To determine the appropriate base offense level for Cline's tax evasion count, the district court calculated the tax loss to be $266,722. J.A. 607-08, 1070. To arrive at this figure, the district court characterized the door revenue as a dividend payment to Cline from one of his companies. J.A. 527, 607-08. It concluded that the company would have paid $69,608 in taxes on the door revenue prior to its distribution as a dividend and included this amount in the total tax loss calculation. (Id.) Based on a tax loss greater than $200,000, the district court

4

assigned a base offense level of 18 to the tax evasion count. J.A. 1077; USSG § 2T4.1.

The district court also concluded that the loss for the Social Security fraud count was $35,622, the entire amount of DIB Cline was charged with improperly receiving. J.A. 607, 1078. It denied Cline's request to offset from this amount the Social Security and Medicare taxes he had inadvertently overpaid on other, unrelated income. The district court determined that the Social Security fraud count carried a base offense level of 12, the sum of a base offense level of 6 plus a 6-level enhancement for causing loss in excess of $30,000. J.A. 1078; USSG § 2B1.1.

Based on these findings, the district court imposed a sentence of 37 months imprisonment. Judgment was entered on April 2, 2008, and Cline timely appealed.


II.

We exercise jurisdiction over this appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). Cline challenges the district court's sentence, contending it erred (1) in applying a 2-level obstruction of justice enhancement under § 3C1.1, (2) in failing to credit his overpayment of Social Security and Medicare taxes in calculating the amount of loss for the Social Security fraud count, and (3) in making conflicting findings of fact with

5

respect to the characterization of the unreported door revenue he appropriated from his nightclubs for personal use. We discuss each assignment of error in turn.

III.

A.

Cline raises three related challenges to the district court's imposition of the 2-level enhancement for obstruction of justice under § 3C1.1 in connection with his attempt to obtain a downward departure for diminished capacity under § 5K2.13. First, he claims that the district court improperly relied on pre-offense conduct. Second, he argues that the district court erred in concluding that he intentionally gave false information to his experts in connection with tests they administered for their analysis and testimony. And third, he contends that, even if he falsified test information, his conduct did not rise to the level required to impose the obstruction of justice enhancement.

1.

We first address Cline's challenge to the district court's determination that § 3C1.1 applies to the facts of his case. This is a legal issue, which we review de novo. United States v. Hicks, 948 F.2d 877, 884 (4th Cir. 1991).

6

A 2-level increase in a defendant's offense level is authorized if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to the defendant's offense of conviction and any relevant conduct." USSG § 3C1.1. Cline argues that the district court relied on pre-offense medical records to support the enhancement and that this reliance was improper because any obstructive conduct evidenced therein is not related to either of the offenses of conviction.

Dr. Miller, Cline's expert, administered a series of psychiatric and psychological tests on Cline to determine his eligibility for a downward departure. Among the tests he administered were: two IQ tests, two Malingering Probability Scale tests (MPS), the Minnesota Multiphasic Personality Inventory test (MMPI-2), and the BRIEF-A test (measuring executive ability and behavior regulation). J.A. 203-10. In rendering his opinion, Dr. Miller relied on the lower of the IQ scores, showing an IQ of 84. J.A. 887. He also rejected the first MPS test result that showed a 99% probability that Cline was malingering and, when the second test result was invalid, rejected it as well. J.A. 243-47. Cline's MMPI-2 test results, which suggested that he experienced moderate to severe emotional

7

distress and was introverted and withdrawn, J.A. 232-33, 888, also showed a high correlation with having been exaggerated for secondary gain. J.A. 236. Cline's BRIEF-A test results raised concerns about his ability to "initiate problem solving or activity, sustain working memory, plan and organize problem-solving approaches, [and] attend to task-oriented output." J.A. 888. Dr. Miller adopted the BRIEF-A test results as valid despite the fact that Cline's answers put him in the 99th percentile of all test takers for severity and an instruction in the test's interpretative guide cautioned that the results should be questioned. J.A. 268-69. Dr. Miller also considered and relied upon Cline's medical records, including pre-offense records, along with his other testing in rendering his opinion that Cline suffered from diminished capacity and had an IQ of 84, demonstrating borderline intellectual functioning. J.A. 886-89.

Dr. Smith, the Government's expert, formed his opinion based on the same test results Dr. Miller interpreted because Cline refused to submit to Dr. Smith's examination. J.A. 429. Dr. Smith opined that Cline's higher IQ test score of 88 was more accurate and, although within the low average intelligence range of 80-88, did not support a conclusion of borderline intellectual functioning. (Id.) Dr. Smith further criticized Dr. Miller for rejecting the first MPS test result that revealed

8

that Cline was malingering so he could conduct a second MPS test, whose results he also rejected. J.A. 437-38. He also opined the MMPI-2 test result demonstrated "extreme over-endorsement" by Cline and indicated that he was "trying to create the impression of a severe psychological problem." J.A. 436. As to the BRIEF-A test results, Dr. Smith testified that Cline "pegs it out at the very top, as if he has very, very, very severe problems in all those areas and it just doesn't comport with the rest of his history to have that serious a problem." J.A. 439. In short, Dr. Smith opined that the results obtained by Dr. Miller undercut a finding of diminished capacity and contained significant evidence of malingering, all of which were inconsistent with the decades of evidence of Cline's ability to thrive in the business world. J.A. 458, 482, 919, 923.

The district court concluded that Dr. Miller deviated from standard testing methodology, ordered and repeated certain tests to significantly influence the results, "disregarded results indicating an extremely high probability" that Cline was malingering, and failed to account for Cline's ability to function day-to-day. J.A. 1073. It found that Cline "attempted to manipulate the results of his psychiatric and psychological evaluations in order to obtain a downward departure under § 5K2.13." J.A. 1076. The § 3C1.1 enhancement was supported, it

concluded, by "test results indicating an extremely high probability of malingering, by defendant's refusal to submit to an independent evaluation for purposes of his motion for a downward departure, and by the conclusions of Dr. Ralph Smith," the Government's expert who confirmed a determination of malingering. J.A. 1076.

There is no evidence that the district court improperly based its application of the § 3C1.1 enhancement on Cline's pre-offense medical records.[3] Rather, it based its determination on evidence that Cline malingered on psychiatric and psychological evaluations administered by Dr. Miller, the results of which were furnished to the district court in support of a downward departure in the present case. (Id.) Thus, we conclude that § 3C1.1 was properly applied based on the facts before the district court.

---

[3] To the extent that Drs. Miller, Saar and Smith referred to Cline's pre-offense medical records in arriving at their respective conclusions as to Cline's condition, it bears noting that Cline introduced the records himself. Cline's Motion to Depart Downward Based on Diminished Capacity references his extensive pre-offense mental history, including this "extensive 15 year history of psychiatric treatment involving several Clinicians." J.A. 878, 881-82. The expert reports Cline submitted in support of his motion also rely on the records. J.A. 887-88. Moreover, his counsel expressly invited the inquiry at the sentencing hearing by stating that Cline had a "constitutional right" to bring to the court's attention the "mental history that [Cline] had for some 17 years." J.A. 615.

10

2.

Cline further contends that the district court erred in concluding that he intentionally falsified his test results. We review a district court's factual findings for clear error. United States v. Layton, ___ F.3d ___, 2009 WL 1110814, at *2 (4th Cir. Apr. 27, 2009). Under a clear error standard of review, a district court's finding will be reversed only if there is a "definite and firm conviction that a mistake has been committed." United States v. Stevenson, 396 F.3d 538, 542 (4th Cir. 2005) (internal quotation marks and citation omitted).

The record amply supports the finding that Cline intentionally faked test results in an effort to reduce his sentence. For example, one of the tests, the MPS, is specifically designed to detect malingering. It demonstrated that Cline had a 99% probability of doing so. J.A. 437. Cline's MMPI-2 and BRIEF-A results also showed that he was grossly exaggerating his symptoms for secondary gain. J.A. 235-36, 436, 438-40, 835, 839. That Cline's expert, Dr. Miller, rejected the MPS results and simply accepted the other test results as valid despite their serious deficiencies does not preclude the district court from relying on such evidence of malingering. J.A. 269-70, 210.

After considering Cline's evidence, the district court concluded that Dr. Saar's testimony was "unsupported by notes or

records of his appointments with the defendant" and that Dr. Miller "deviated from standard testing methodology" and disregarded key test results that undermined his opinion. J.A. 1073. Instead, the district court found the testimony of Dr. Smith, whose report Dr. Miller characterized as "excellent, well-written and well-reasoned," to be more consistent with the record as a whole. J.A. 196. Dr. Smith concluded that Cline's MMPI-2 results evidenced his "distortion or exaggeration of the severity of [his] psychopathology in an attempt to derive secondary gain . . . and [that he] has distorted and greatly exaggerated his problems to create the impression of a severe psychological problem." J.A. 919. In concluding that Cline "willfully manipulated his test answers in an attempt to demonstrate the mental capacity necessary to obtain a downward departure," J.A. 1074, the district court plainly found Dr. Smith's testimony more credible. A district court's credibility determinations receive "great deference." United States v. Feurtado, 191 F.3d 420, 424 n.2 (4th Cir. 1999). Moreover, in situations where there are "two permissible views of the evidence, the [district court's] choice between them cannot be clearly erroneous." Stevenson, 396 F.3d at 542 (internal quotation marks and citation omitted). Thus, Cline fails to demonstrate that the district court clearly erred in concluding that he falsified test information based on the court's

12

crediting of Dr. Smith's testimony over that of Drs. Miller and Saar.

3.

Cline contends that, even had he falsified responses on Dr. Miller's tests, such conduct would not rise to the level of egregiousness necessary to trigger the § 3C1.1 enhancement. (Appellant's Br. at 19.) We review the application of § 3C1.1 to the facts de novo. Hicks, 948 F.2d at 884.

The district court found that Cline's deliberate manipulation of his answers to psychiatric and psychological tests was calculated to lead his examiners to misrepresent his mental capacity to the district court. J.A. 619-22. Providing materially false information to a judge is an explicit basis for the enhancement. USSG § 3C1.1 cmt. n.4. Material information means "evidence, fact, statement or information that, if believed, would tend to influence or affect the issue under determination." USSG § 3C1.1 cmt. n.6. Cline's falsification of test results was intended to mislead the district court into concluding that he was eligible for a downward departure. Therefore, the district court properly applied the enhancement upon a finding that Cline willfully obstructed the administration of justice with respect to his sentencing by providing false answers to the district court through his examiners, with the goal of receiving a downward departure to

13

which he was not entitled.  See United States v. Frierson, No. 08-6254, 2009 WL 766533, at *2 (10th Cir. Mar. 24, 2009) (unpublished) (affirming district court's imposition of obstruction of justice enhancement under § 3C1.1 for defendant's malingering on his post-plea competency tests); United States v. Greer, 158 F.3d 228, 234-38 (5th Cir. 1998) (finding obstruction enhancement proper for defendant who feigned incompetency by misrepresenting his psychiatric condition to his examiners, intending for them to present their inaccurate impressions to the court).

B.

Cline also challenges the district court's sentence on his Social Security fraud count.  The district court concluded that the loss on this count was $35,622, the total amount of DIB Cline received from February 1995 to March 2003.  J.A. 1078.  In 2001 and 2002, Cline inadvertently overpaid Social Security and Medicare taxes on other income in the amount of $14,380, a sum he argues should have been credited against the amount of DIB payments he improperly received from the Government.  We review the district court's application of the Guidelines de novo. Layton, ___ F.3d at ___, 2009 WL 1110814, at *2.

The district court calculated the Government's loss under USSG § 2B1.1, cmt. n.3(F)(ii), which provides, in pertinent part, that in government benefit cases "loss shall be considered

14

to be not less than the value of the benefits obtained by unintended recipients." The district court thus determined that the loss for the Social Security fraud count was $35,622, the total amount of DIB Cline was charged with improperly receiving. J.A. 1078. Cline urges application of the "net loss" theory under which the Government's loss would be reduced by "the money returned . . . by the defendant . . . to the victim before the offense was detected." USSG § 2B1.1, cmt. n.3(E). A credit for his overpayment of taxes would reduce the amount of the social security loss to $21,242, resulting in a 2-level decrease in his base offense level.[4] USSG § 2B1.1(b)(1).

We find Cline's argument to be without merit. The district court's calculation of loss was consistent with the Application Notes, which define loss as "the greater of actual or intended loss." USSG § 2B1.1 cmt. n.3(A). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense," and intended loss is "the pecuniary harm that was intended to result from the offense." USSG § 2B1.1 cmt. n.3(A)(i)-(ii). In making "loss" calculations, the sentencing court is instructed to hold the defendant "responsible for the amount of loss which was intended, not the actual loss ultimately sustained." United States v. Loayza, 107 F.3d 257,

---

[4] The base offense level is enhanced by 4 levels for a loss greater than $10,000, and by 6 levels for a loss greater than $30,000. USSG § 2B1.1.

15

266 (4th Cir. 1997) (refusing to apply net loss theory and credit payments made to victims of Ponzi scheme against amount of loss intended by perpetrator); cf. United States v. Phelps, 478 F.3d 680, 682 (5th Cir. 2007) ("We are not persuaded that the amount of tax loss Appellant intended to cause should be reduced simply because his scheme to defraud apparently inadvertently caused payment of excess social security taxes.").

Because Cline's overpayments were "erroneous," his intended harm was the full amount of DIB he improperly received. Moreover, Cline has provided no case applying the net loss theory to government benefit cases, and nothing in the Application Notes suggests such an application is required here. Accordingly, the district court properly applied § 2B1.1 cmt. n.3(F)(ii) to calculate "loss" in the Social Security fraud count as the sum total of DIB payments Cline improperly received from the Government.[5]

---

[5] Cline is correct that the trial court's Sealed Memorandum of Sentencing Hearing ("Sealed Memorandum") misstates his argument as one requesting a credit against the calculation of loss for the tax evasion count, rather than for the Social Security fraud count. J.A. 1072. However, the transcript from his sentencing hearing demonstrates that the district court understood his request as an offset against the loss for the Social Security fraud count, and orally denied it. J.A. 606-607. Because the request was denied orally at the sentencing hearing, the error in the Sealed Memorandum had no impact on Cline's sentence and does not alter the fact that the amount of loss was properly calculated under USSG § 2B1.1.

16

Cline argues next that the district court committed clear error in calculating the loss on the tax evasion count when it characterized the unreported door revenue he appropriated from his nightclubs as dividend payments rather than a salary. Cline contends this error had two significant consequences. First, he claims it increased the amount of the tax loss and resulted in a higher base offense level for the tax evasion count. Second, he contends that it is incompatible with the district court's findings of fact to support the Social Security fraud count. The district court's characterization of the door revenue as a dividend payment is a factual determination reviewable for clear error. <u>Layton</u>, ___ F.3d at ___, 2009 WL 1110814, at *2.

1.

The district court calculated the loss for the tax evasion count at $266,772. This sum includes $69,608, the amount of tax one of Cline's companies would have paid on the approximately $204,730 in unreported door revenue before paying it out to Cline as a dividend distribution.[6] J.A. 670. Cline contends that the door revenue should have been classified as a salary and thereby a deductible expense to Cline's corporation on which

---

[6] The door revenue would have been treated first as income to one of Cline's companies and been subject to taxation at the 34% corporate rate before being paid out as a dividend to Cline individually. J.A. 527; <u>see</u> USSG § 2T1.1(c)(1)(A).

17

no tax would have been owed, resulting in no net loss of tax revenue to the Government. Treated in this fashion, the Government's loss on the tax evasion count would have been less than $200,000 and resulted in a base offense level of 16 rather than 18.[7] J.A. 1077.

Cline's contention is without merit. The record is replete with testimony that although Cline was encouraged on more than one occasion by his accountant and his lawyer to draw a salary, he refused to do so. J.A. 311-12, 534, 951-52. The district court understandably found Cline's post-conviction argument that he would have characterized the door revenue as a salary lacking in credibility. Moreover, in United States v. Delfino, 510 F.3d 468, 473 (4th Cir. 2007), this court refused to engage in post-hoc determinations of how a defendant, convicted of tax evasion, would have completed his tax returns had he not committed tax fraud.[8] The district court's characterization of the door revenue as a dividend was not clear error.

---

[7] A tax loss greater than $80,000 results in a base offense level of 16; whereas a tax loss greater than $200,000 results in a base offense level of 18. USSG § 2T2.1 & 4.1.

[8] Cline attempts to distinguish Delfino on factual grounds, claiming that, unlike Delfino, he actually filed tax returns and cooperated with the IRS audit. (Pet'r Br. 35.) None of these facts affects the holding that a district court is not required to speculate and reconstruct what a convicted tax evader would have claimed as deductions on a hypothetical tax return. Delfino, 510 F.3d at 473.

2.

Cline contends lastly that the district court made incompatible findings of fact in classifying the door revenue as a salary for purposes of the Social Security fraud count and as a dividend in calculating the loss for the tax evasion count. This argument incorrectly presumes that the Social Security fraud count is premised upon his receipt of a salary. Cline's conviction for Social Security fraud is premised on a violation of 42 U.S.C. § 408(a)(4), based on his failure to disclose events that affected his eligibility for DIB with the intent to fraudulently secure such payments in an amount greater than he was due.[9] J.A. 14.

An individual must be under a "disability" to qualify for DIB. 42 U.S.C. § 423(a)(1)(E). An individual is not eligible for DIB if he is engaged in substantial gainful work activity. 20 C.F.R. § 416.920(b). Work is substantial if it involves doing significant physical or mental activities and is gainful if it "is the kind of work usually done for pay or profit,

---

[9] Section 408(a)(2) provides that whoever:

"having knowledge of the occurrence of any event affecting (1) his initial or continued right to any payment under this subchapter, or (2) the initial or continued right to any payment of any other individual in whose behalf he has applied for or is receiving such payment, conceals or fails to disclose such event with an intent fraudulently to secure payment either in a greater amount than is due or when no payment is authorized shall be guilty of a felony."

19

whether or not a profit is realized." 20 C.F.R. § 416.972(a)-(b) (emphasis added). In this case, Cline owned, operated and managed a chain of nightclubs and adult entertainment establishments through a complex corporate structure involving a number of entities. The record indicates that Cline was "very active" in the operation of his clubs, monitoring nightly alcohol sales and door revenues vigilantly and conducting weekly reviews of reports detailing dancers' individual sales. J.A. 954, 957-961. Whether and how he was compensated is irrelevant -- the operative facts are that he was engaged in significant physical or mental activity that is usually done for pay or profit, thereby making him ineligible for DIB payments, and that he failed to disclose this activity. Because the nature of the compensation is not part of the offense conduct, Cline's Social Security fraud conviction did not require a factual finding as to whether the compensation was a salary or a dividend. Therefore, no conflicting findings of fact exist between the Social Security fraud and tax evasion counts.

IV.

For the foregoing reasons, the sentence imposed on Cline by the district court is

AFFIRMED.

20